654

THE STATE OF WASHINGTON, *Respondent*, v. DREW
THOMPSON, *Appellant*.

*L. Stephen Rochon,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Tod J. Bergstrom, Deputy,* for respondent.

COLEMAN, J. — Drew Thompson appeals his conviction for first degree murder, arguing that (1) the trial court erred by admitting evidence of the victim's habits and character in order to show the corpus delicti of the crime and by concluding that the State had produced sufficient evidence

of the corpus delicti, (2) the prosecutor engaged in misconduct in his closing arguments by making statements that the evidence did not support, and (3) the evidence was insufficient to connect him to the crime beyond a reasonable doubt. We affirm.[1]

In the early 1970's, Rita Bartschot and her mother moved into a house in the Ravenna neighborhood in Seattle. In the early 1980's, Bartschot moved to the Tri-Cities area in eastern Washington, where she taught chemistry at Columbia Basin Community College. Her mother died in June 1990. Later that summer, Bartschot signed a contract to continue teaching during the 1990-1991 school year and prepared handouts for her 1990 fall quarter classes and faculty senate meetings.

In August 1990, Bartschot was staying at her deceased mother's house in Seattle. She planned to meet with an architect in late August to prepare for remodeling the house. On August 22, Bartschot's closest friend, Susan Berry, called her, and they made plans to attend Bumbershoot in Seattle on August 31. Beginning on August 24, Berry called Bartschot several times each day and got no answer. After several days, Berry became concerned because Bartschot had never been absent for more than a 24-hour period. On August 30, Berry called Bartschot's next-door neighbor, Julie Pierce, and told her about her concerns. Pierce, who had the keys to Bartschot's house, promised to go inside and check Bartschot's house the next day.

On the morning of August 24, Pierce had seen Bartschot in the yard doing some work, and they chatted briefly. Pierce, who used Bartschot's garage when Bartschot was not there, promised to return her garage door opener later that week. When Pierce came home that evening, she noticed that Bartschot's car was gone. The next two mornings, the car still was not there. During the week of August 26-30, Pierce did not see Bartschot's car and noticed that Bartschot's house seemed empty.

---

[1]Thompson also argues that defense counsel's performance was deficient because he did not preserve error by contemporaneously objecting to all of the character evidence offered by the State. However, because we conclude that the evidence was admissible, we also conclude that defense counsel's failure to object did not constitute deficient performance.

On August 31, after Pierce received the call from Susan Berry, she let herself into Bartschot's house. The television was on and the cat "came dashing at her" and seemed "totally frantic". She noticed that the cat's dishes were dry and gave it food and water. The cat immediately started eating and drinking. Pierce also noticed a moldy coffeepot and dirty dishes. She then called 911 and reported Bartschot missing.

Police began investigating Bartschot's disappearance on September 1, 1990. When they examined her personal finances, they discovered that someone had been using her automatic teller machine (ATM) card every day since her disappearance, withdrawing the maximum allowable amount almost each time. A hidden camera had taken photos of the person using the card, and one of the investigating officers recognized that person as Drew Thompson. Police staked out the cash machine that Thompson was using and arrested him as he was making a withdrawal from Bartschot's account.

On September 11, 1990, Bartschot's car was found abandoned in the University District in Seattle. Small bloodstains, consistent with Bartschot's blood type, were found on the back seat of the car. Police also found dirt, leaf fragments, and other vegetable material in the car. Thompson's fingerprints were found inside the driver's side window, and a search of Thompson's apartment produced the ignition key to the car, a second ATM card belonging to Bartschot, and Bartschot's checkbook. At trial, witnesses testified that they had observed Thompson driving Bartschot's car and that the car had been parked near Thompson's home in late August.

After his arrest in September 1990, Thompson shared a cell at the King County Jail with Kevin Olsen, a person with an extensive criminal history. Olsen testified that Thompson said he threatened Bartschot in order to get her personal identification number (PIN) for her ATM card. According to Olsen, Thompson said he did not have any problem getting the PIN number from Bartschot and that he "had kept her until he verified that the numbers were good". Olsen also stated that Thompson told him that the police would not be able to find Bartschot.

People who knew Bartschot testified at trial regarding her habits and personality. Susan Berry testified that Bartschot loved cats and all animals and that she always took very good care of her pets. Julie Pierce testified that Bartschot treated her cat as she would a child and that when Bartschot left the house she would turn on the television or the stereo to keep the cat company. Pierce also testified that Bartschot would always leave enough food for the cat during her absence. Pierce's husband testified that Bartschot always let them know when she was going to be at her mother's house and when she was going back to eastern Washington.

Berry and Pierce also testified that Bartschot was a very good housekeeper, that she was very orderly and tidy, and that it was very important to her to keep her house and car clean. Berry further testified that Bartschot was prudent about personal security, she locked her doors when she was home, she rarely dated, she did not frequent bars, she had never lent her car to anyone, and she drank alcohol sparingly.

Other witnesses testified that Bartschot was extremely conscientious, consistently punctual, and always notified the affected parties if she was going to be late or miss an appointment. The personnel director at the community college where Bartschot taught testified that Bartschot had not taken a single sick day between 1983 and 1990. Bartschot's dentist's assistant testified that during a 10-year period, Bartschot had never missed a dental appointment.[2]

A jury convicted Thompson of murder in the first degree, and he was sentenced within the standard range. Thompson appeals.

We initially consider whether the trial court erred by admitting evidence of the victim's habits and character in order to show the corpus delicti of the crime, and whether the independent proof was sufficient to establish the corpus delicti.

A defendant's extrajudicial confession is not admissible at trial unless independent proof establishes the corpus delicti of a crime. *State v. Neslund*, 50 Wn. App. 531, 542, 749

---

[2]Bartschot missed the appointment she had scheduled for August 31, 1990.

P.2d 725 (citing *Bremerton v. Corbett*, 106 Wn.2d 569, 574-
75, 723 P.2d 1135 (1986)), *review denied*, 110 Wn.2d 1025
(1988). To establish the corpus delicti of murder, the State
must show (1) the fact of death and (2) a causal connection
between the death and a criminal agency. *Neslund*, at 542
(citing *State v. Lung*, 70 Wn.2d 365, 371, 423 P.2d 72 (1967);
*State v. Quillin*, 49 Wn. App. 155, 162, 741 P.2d 589 (1987),
*review denied*, 109 Wn.2d 1027 (1988)). The State need not
show a causal connection between the defendant and the
crime and can rely entirely on circumstantial evidence to
establish the elements of the corpus delicti. *State v. Sellers*,
39 Wn. App. 799, 802, 695 P.2d 1014 (citing *State v. Adams*,
76 Wn.2d 650, 458 P.2d 558 (1969), *rev'd in part on other
grounds*, 403 U.S. 947, 29 L. Ed. 2d 855, 91 S. Ct. 2273
(1971)), *review denied*, 103 Wn.2d 1036 (1985).

A

ADMISSIBILITY OF HABIT AND CHARACTER EVIDENCE TO SHOW
CORPUS DELICTI

 ER 404(a) provides that, except in limited instances,
evidence of a person's character or trait of character is not
admissible to prove that the person acted in conformity
therewith on a particular occasion.[3] ER 406 provides that ev-
idence of a person's habit is relevant to prove that the
person's conduct on a particular occasion was in conformity
with the habit.[4] The determination of whether evidence is
admissible is within the discretion of the trial court. *Norris
v. State*, 46 Wn. App. 822, 826, 733 P.2d 231 (1987) (citing
*Maehren v. Seattle*, 92 Wn.2d 480, 599 P.2d 1255 (1979), *cert.
denied*, 452 U.S. 938 (1981)).

---

[3]In Edward W. Cleary, *McCormick on Evidence* § 195, at 574 (3d ed. 1984),
character is defined as "a generalized description of a person's disposition, or of the
disposition in respect to a general trait, such as honesty, temperance or peaceful-
ness." (Footnote omitted.)

[4]The comment to ER 406 states that "habit describes one's regular response to
a repeated specific situation so that doing the habitual act becomes semi-automatic.
It is the notion of the invariable regularity that gives habit evidence its probative
force."

Thompson first argues that the trial court erred by admitting evidence of the victim's habits and character to help show the corpus delicti of the crime. He argues that habit evidence was improperly admitted because ER 406 by its terms does not permit evidence of habit to prove what a person might do in the future, only to prove something that has already occurred. He further argues that evidence of Bartschot's habits frequently overlapped with inadmissible evidence of her character. Thus, he argues, the trial court abused its discretion in admitting the evidence.

The issue of whether habit evidence is admissible to establish the corpus delicti of a crime has not been addressed in Washington. However, the State has cited two cases from other jurisdictions that have addressed this issue, *Derring v. State*, 273 Ark. 347, 619 S.W.2d 644 (1981) and *Epperly v. Commonwealth*, 224 Va. 214, 294 S.E.2d 882 (1982).

In *Derring*, the State's theory was that the defendant, who had been hitchhiking, killed the victim and disposed of his body after the victim stopped to help him. The State introduced considerable evidence of the victim's habits to establish that he did not disappear of his own volition. This evidence included testimony that the victim was "dependable in his routine, kept a fairly rigid schedule, always had breakfast with the same person each day, attended school regularly, had no bad habits, and returned home to his apartment at the same time each evening." The victim's parents testified that he called them regularly, and in order to show that the victim had stopped to help the defendant, the State introduced evidence of the victim's "good Samaritan" tendency. Evidence was also introduced that the victim was religious. *Derring*, at 352.

The Supreme Court of Arkansas first noted that habit and character are closely related. The court then held that although some overlapping of habit and character evidence may have occurred, the trial court did not abuse its discretion in admitting the evidence to establish the corpus delicti of the crime. The court noted that the trial judge, upon defense counsel's objection, "admonished several times that

he was admitting this evidence on the issue of habit, and not as character evidence." *Derring*, at 342.

In *Epperly*, the State's theory was that the defendant raped or attempted to rape the victim and then killed her and disposed of her body. Witnesses testified that the victim was very beautiful, well dressed, pleasant, soft-spoken, popular, and that she went to church. Witnesses also testified that she used alcohol sparingly, did not use drugs or smoke, that she was very modest, and had no physical or psychological problems. *Epperly*, at 219.

The Supreme Court of Virginia held that the evidence was admissible to establish the corpus delicti of the crime. The court noted that character evidence is not generally admissible to show the peaceable nature of the deceased. However, the court concluded that the evidence was admissible because the State had the burden of proving by circumstantial evidence that the victim was dead as a result of a criminal act. The court stated:

> The evidence must be such as to foreclose every reasonable hypothesis of innocence, including suicide, natural death, accidental death, justifiable or excusable homicide, or continuing life *in absentia*. The evidence objected to was relevant to negate these theories. It showed the unlikelihood that [the victim] would take her own life, flee, or fall victim to accidental death because of some dangerous habit or practice.

*Epperly*, at 230. Thus, the court held that such evidence was admissible for the purposes of proving the corpus delicti by circumstantial evidence.[5]

■ As noted by the court in *State v. Lung*, 70 Wn.2d 365, 371, 423 P.2d 72 (1967), in a homicide case where the victim's body has not been located, "the circumstances surrounding the disappearance of the victim must be such as to convince the mind to a moral certainty of death, and to the exclusion of every other reasonable hypothesis." We believe

---

[5]Thompson argues that *Epperly* is inapplicable because Virginia has not adopted the Rules of Evidence and "the court apparently was not guided by evidence rules similar to ER 404 and 406." Br. of Appellant, at 32. However, the *Epperly* court stated that character evidence is not generally admissible in Virginia. *Epperly*, at 230.

that evidence of the victim's habits is clearly relevant and admissible to show that the victim is deceased.

In addition, to the extent that habit evidence overlaps with evidence of the victim's character, we do not believe that ER 404(a) applies. That rule provides that character evidence is not admissible to show that the victim acted in conformity therewith. However, in this case, the evidence was admitted to show the fact of death by establishing Bartschot's habits, her personality, the way she conducted herself, and her routine.[6] It was not introduced to show that Bartschot acted in conformity with a particular character or habit trait on a particular occasion, nor was it introduced to contrast Bartschot's character with Thompson's.

Thus, we conclude that in a corpus delicti case, ER 404(a) does not preclude the admission of overlapping habit and character evidence provided it is relevant to show by circumstantial evidence the fact of death by a criminal agency. We note that if Bartschot had been a person who habitually disappeared without feeding her cat or notifying anyone, the defense would likely have been permitted to introduce testimony to that effect.

## B

### SUFFICIENCY OF EVIDENCE TO ESTABLISH CORPUS DELICTI

██ The State's independent proof need not establish the necessary elements of the corpus delicti beyond a reasonable doubt or even by a preponderance of the evidence — it is sufficient if it prima facie establishes the corpus delicti. *Lung*, at 372 (quoting *State v. Meyer*, 37 Wn.2d 759, 226 P.2d 204 (1951)). In assessing the sufficiency of the State's corpus delicti evidence, the reviewing court must assume the truth of the State's evidence and must make all reasonable inferences in favor of the State. *Neslund*, at 544 (citing *Corbett*, at 571).

---

[6]Thompson claims that the following constituted character evidence: (1) Bartschot was a good housekeeper, (2) she was careful about personal security, (3) she was punctual, (4) she was conscientious, and (5) she loved animals and took good care of her pets.

Here, the State provided ample evidence to establish prima facie that Bartschot had died and that there was a causal connection between her death and a criminal agency. As discussed, *infra*, the evidence of Bartschot's habits was admissible. This evidence showed that Bartschot never missed appointments without informing the affected parties, she never had been gone for more than a 24-hour period, she was a good housekeeper, she let people know where she was, she did not have any dangerous habits, she had prepared for the upcoming fall quarter and had made plans to remodel her mother's house, she took excellent care of her pets, and her physical and psychological health was good.

In contrast to the above evidence, there was evidence that Bartschot, after making several appointments and having numerous obligations to fulfill, disappeared without telling anyone, that a moldy coffeepot and dirty dishes were found in her house, and that her cat was left for days without food and water. When all this evidence is viewed together, a strong inference is raised that Bartschot died and that her death was sudden and caused by criminal means. This conclusion is further supported by the bloodstains in Bartschot's car and the evidence that Thompson had been using her car and her ATM card. We conclude that the State introduced sufficient evidence to show the corpus delicti of the crime.

We next determine whether the prosecutor engaged in misconduct by making statements that the evidence did not support.

A defendant's right to a fair trial is denied when the prosecutor makes improper comments and there is a substantial likelihood that the comments affected the jury's decision. *State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984). Public prosecutors cannot appeal to prejudice or seek to procure a conviction "through the aid of passion, sympathy or resentment.'" *Reed*, at 147 (quoting *State v. Case*, 49 Wn.2d 66, 70-71, 298 P.2d 500 (1956)). In addition, an attorney may not mislead the jury in summarizing the evidence during closing arguments. *State v. Reeder*, 46

Wn.2d 888, 892, 285 P.2d 884 (1955). In the absence of an objection by defense counsel, reversal is required only if the misconduct was so prejudicial that it could not have been cured by an objection and a curative instruction. *State v. Stith*, 71 Wn. App. 14, 20, 856 P.2d 415 (1993) (citing *State v. Stover*, 67 Wn. App. 228, 232, 834 P.2d 671 (1992), *review denied*, 120 Wn.2d 1025 (1993)).

Here, Thompson objects to two comments made by the prosecutor during closing arguments. First, Thompson objects to the prosecutor's statement that there was no evidence of grass clippings in the car and no evidence that Thompson used the car to dump trash.[7] This statement was followed by the prosecutor's claim that Thompson "substituted dumping trash for dumping the body of Rita Bartschot". We agree that these comments mischaracterized the evidence and were contrary to the testimony of police investigators, who stated that they found dirt, leaf fragments, and other vegetable material in the car. However, because defense counsel did not object to these comments and an instruction could have cured the discrepancy, we conclude that the comments do not constitute reversible error.

Second, Thompson objects to the prosecutor's statement that Bartschot did not need to refer to a piece of paper for her PIN number because she "had memorized the entire chemistry code". Thompson claims that there was no evidence that Bartschot had memorized the entire chemistry code. However, there is no reasonable possibility that this minor overstatement could have affected the outcome of the trial.[8] Therefore, we conclude that Thompson cannot meet his burden of showing that the prosecutor's statements prejudiced him.

---

[7]The prosecutor stated: "The defendant also, in trying to explain how his hair got in the back of the car, gave you an interesting look into the mind of a killer when he tries to explain why that hair was in the back of the car. He says I went to the dump, and then pressed, I threw trash, I threw a crankshaft in the back, yard clippings, *but the forensic analysts that you heard didn't have any evidence of grass clippings in the car*." (Italics ours.)

[8]Furthermore, as discussed, *infra*, the evidence against Thompson was very strong.

Finally, we determine whether the evidence was sufficient to connect Thompson to the crime beyond a reasonable doubt.

■ Evidence is sufficient to support a conviction when, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *State v. Hoffman*, 116 Wn.2d 51, 82, 804 P.2d 577 (1991) (citing *State v. Hughes*, 106 Wn.2d 176, 199, 721 P.2d 902 (1986); *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980)).[9] A person is guilty of premeditated murder in the first degree when, with premeditated intent, he causes the death of such person or a third person. RCW 9A.32.030(1)(a).

Here, Thompson argues that Olsen's testimony was the only evidence to refute his claim that he had never met or killed Bartschot. Because Olsen was "an admitted felon, thief, drug addict, and liar", Thompson argues, this testimony was not sufficient to connect him to the crime.

■ We find this argument unpersuasive. The jury is entitled to determine the credibility and weight of witnesses' testimony. *State v. Alvarez*, 45 Wn. App. 407, 413, 726 P.2d 43 (1986), *review denied*, 107 Wn.2d 1022 (1987). In addition, contrary to Thompson's argument, Olsen's testimony was not the only evidence connecting him to the crime. Other evidence connecting him to the crime included the fact that Thompson knew Bartschot's PIN number and was using her ATM card, the other items found in Thompson's apartment, and the evidence that Thompson had been using Bartschot's car.

Moreover, the jury could easily have found that Thompson's testimony was not credible. He testified at trial that he found Bartschot's wallet in her abandoned car, that the PIN number was written on a piece of paper in her wallet, and that there was a key to the car in the glove compartment.[10] However,

---

[9]*Hoffman* is not cited by the parties.

[10]This story differed from the story that Thompson initially told his father. At trial, Thompson's father testified that after Thompson's arrest for Bartschot's murder, Thompson told him that someone else had committed the crime and that he was covering for that person.

other witnesses testified that Bartschot never referred to a piece of paper when using the ATM machine. In addition, Bartschot had the same PIN number for 8 years and it was highly unlikely that she did not have the number memorized. Furthermore, witnesses testified that Bartschot was very careful about personal security, making it even more unlikely that she would keep her PIN number in her wallet and her car key in the glove compartment. In sum, we conclude that the evidence was sufficient for any reasonable jury to find the elements of the crime beyond a reasonable doubt.

The judgment and sentence of the trial court are affirmed.

GROSSE and BECKER, JJ., concur.

Reconsideration denied May 18, 1994.

Review denied at 125 Wn.2d 1014 (1994).