# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| BERNARDO FIGUEROA and ROSA FIGUEROA, husband and wife, | No. 68272-5-I |
| Respondents, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| HIGHLINE MEDICAL CENTER, a Washington non-profit corporation, | |
| Defendant, | |
| THOMAS RYAN, M.D., | |
| Appellant, | |
| and HIGHLINE EMERGENCY PHYSICIANS, PLLC, a Washington Professional Limited Liability Company, | FILED: October 14, 2013 |
| Defendant. | |

GROSSE, J. — Generally, all relevant evidence is admissible except as limited by constitution, statute, or other evidentiary rule.[1]   In a medical malpractice suit, physicians may testify as to their professional conduct that is repeatedly and consistently performed when treating persons with similar symptoms so long as it is relevant.   Here, the trial court did not abuse its discretion in excluding certain evidence offered by defendant-physician because the conduct described did not meet the standard for habit evidence.

Nor did the trial court abuse its discretion in its other evidentiary rulings or in declining to give an instruction proffered by the defendant-physician, particularly here, where the jury received proper standard of care instructions and

---

[1] See ER 401.

was accurately instructed on the law and permitted the defendant-physician to argue his theory of the case. The trial court is affirmed.

## FACTS

At approximately 3:00 p.m., on October 3, 2005, Bernardo Figueroa's wife, Rosa, drove him to Highland Hospital's emergency room because he was experiencing abdominal pain. Dr. Thomas Ryan examined Figueroa and ordered a computed tomography (CT) scan to rule out appendicitis. An intravenous (IV) needle was attached to Figueroa's right hand. When contrast dye was injected, Figueroa experienced a great deal of pain. Approximately 60 milliliters of the IV fluid with the contrast dye escaped from the vein. The medical term for this event is extravasation. Usually extravasation results in swelling and pain, which is treated by ice, elevation, and observation. In rare instances, extravasation can result in compartment syndrome, which, if left untreated, can result in the collapse of the veins.[2] The treatment for compartment syndrome is a fasciotomy, a surgery in which the fascia (connective tissue) surrounding the veins is cut until the pressure decreases and the affected vessels can re-expand. If not treated in a timely manner, compartment syndrome can cause partial paralysis.

After the IV was removed, Figueroa returned to the emergency room with extravasation, still experiencing pain and swelling in his arm. His arm was elevated and ice was applied to reduce swelling. Dr. Ryan ordered a Demerol injection for pain, after which Figueroa experienced less pain. The CT scan result was negative for appendicitis and Figueroa was discharged at 5:28 p.m.

---

[2] Compartment is a part of the body that is enclosed by thick connective tissue.

Figueroa continued to experience pain at home and when it became unbearable, he returned to the emergency room at 9:40 p.m. Figueroa presented with forearm pain, numbness, and swelling. Figueroa was diagnosed with compartment syndrome and was immediately transferred to the Burien Hospital campus for surgery, where Dr. Vincent Muoneke performed an emergency fasciotomy approximately eight hours after the extravasation.

In the following days, Figueroa continued to experience problems with his arm and was referred to Dr. Clark for a second opinion. Dr. Clark observed that, because the operation took place over six hours after the extravasation, the operation did not totally repair the damage from the compartment syndrome. Because of this injury, Figueroa continues to experience "decreased motion, significant stiffness and continued pain as well as parathesia in the median nerve distribution . . . ."

At trial, the defense sought to impeach Figueroa's description of his inability to perform certain actions by showing a video recording of Figueroa performing some operations with his arm that he claimed he was unable to do. Figueroa offered rebuttal testimony explaining some of those actions. The matter went to the jury who found for Figueroa and awarded him $122,000.00.

Dr. Ryan appeals, raising a variety of evidentiary rulings and instructional error.

## ANALYSIS

Dr. Ryan contends the trial court's rulings on a variety of evidentiary issues resulted in a one-sided presentation of evidence and prevented him from

3

defending the suit. A trial court's decisions to admit or exclude evidence are reviewed for abuse of discretion.[3] "A trial court abuses its discretion when its decision 'is manifestly unreasonable or based on untenable grounds or reasons.'"[4]

Evidence of Habit

Dr. Ryan argues that the trial court improperly precluded him from testifying as to his habit and routine practice of orally instructing patients with compartment syndrome. Evidence of the habit of a person, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person on a particular occasion conformed to habit or routine.[5] Under ER 406, relevant evidence is admissible to prove behavior in conformity with habit on a particular occasion.[6] Washington courts have found a broad range of conduct to rise to the level of habit. Courts consider the regularity of the behavior and the surrounding circumstances in determining whether particular conduct rises to the level of habit, as it is "'the notion of the invariable regularity that gives habit evidence its probative force.'"[7] In Meyers v.

---

[3] Salas v. Hi-Tech Erectors, 168 Wn.2d 664, 668, 230 P.3d 583 (2010).

[4] Salas, 168 Wn.2d at 668-69 (quoting State v. Stenson, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997)).

[5] ER 406.

[6] ER 406 provides:
> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

See also Meyers v. Meyers, 81 Wn.2d 533, 503 P.2d 59 (1972).

[7] State v. Thompson, 73 Wn. App. 654, 659 n.4, 870 P.2d 1022 (1994) (quoting comment to ER 406); see also State v. Young, 48 Wn. App. 406, 739 P.2d 1170

Meyers, the Supreme Court found testimony offered by a defendant about her standard business practices admissible, even though such behavior required some degree of conscious action as opposed to being a nearly involuntary or automatic response to given stimuli.[8] Meyers involved a notary public who was permitted to testify it was her professional habit to always ask for identification before notarizing a document. Moreover, the Meyers court held that the exclusion of such testimony would be reversible error.[9]

However, not all behavior claimed as regular and consistent in similar circumstances is admissible as habit evidence under ER 406. For example, in Washington State Physicians Insurance Exchange & Ass'n v. Fisons Corp., a case cited by the trial court in its ruling, the Supreme Court upheld the exclusion of a drug company sales representative's testimony regarding his typical business-related conversations with physicians, determining that such conduct did not rise to the level of habit.[10] The Supreme Court defined habitual behavior in Fisons as "semi-automatic, almost involuntary and invariabl[y] specific responses to fairly specific stimuli."[11]

---

[8] 81 Wn.2d 533, 503 P.2d 59 (1972).

(1987) (citing Breimon v. General Motors Corp., 8 Wn. App. 747, 752-54, 509 P.2d 398 (1973)).

[9] Meyers, 81 Wn.2d at 538-39; see also Heigis v. Cepeda, 71 Wn. App. 626, 862 P.2d 129 (1993) (upholding evidence from insurance claims adjuster that it was her habit to advise claimants in double-claim situations that she represented an adverse party even though the adjuster had no memory of the particular transaction in dispute); State v. Maule, 35 Wn. App. 287, 291-92, 667 P.2d 96 (1983) (upholding admission of testimony from a child abuse expert regarding her usual interviewing habits offered to prove that her interviews with victims in the case conformed to her usual professional practices).

[10] 122 Wn.2d 299, 325, 858 P.2d 1054 (1993).

[11] Fisons, 122 Wn.2d at 325 (internal quotation marks and citations omitted).

5

Here, Dr. Ryan's actions were not similar to those at issue in Meyers because the actions were not consistent and automatic. Nor do Dr. Ryan's actions fit within the definition of habitual behavior in Fisons. Dr. Ryan and his expert both testified that compartment syndrome is rare in cases of extravasation. This indicates that his practice of orally instructing patients with extravasation was not routine or habitual. Indeed, Dr. Ryan testified that he had not seen compartment syndrome caused by extravasation either before or since Figueroa. Moreover, Dr. Ryan's testimony revealed that he did not remember Figueroa and could not recall treating him. Nevertheless, Dr. Ryan testified, without objection, that he was surprised that Figueroa came back with a swollen hand from an extravasation. Further, in response to a question of what he would have done if he had found something significantly abnormal, Dr. Ryan stated he would have admitted him. His remaining testimony about what he would have done differently was not indicative of his habit or routine. For example, Dr. Ryan further testified that if Figueroa had compartment syndrome, he would have consulted a hand surgeon and had him admitted; but did not do so because he was confident that there was no compartment syndrome. The record reveals that Dr. Ryan was permitted to testify that he routinely orally advises patients to return to the emergency room if they experience increased pain. Dr. Ryan also testified that he gave Figueroa compartment syndrome warnings or instructions because of the swelling even though he did not have compartment syndrome when he left. Because this evidence was placed before the jury, Dr. Ryan fails to establish that

he was unduly prejudiced by the evidentiary ruling to which he does object. There was no abuse of discretion.

Excluded Alias

Under ER 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.[12] The trial court has "broad discretion to balance probative value versus prejudice under ER 403."[13] "When evidence is likely to stimulate an emotional response rather than a rational decision, a danger of unfair prejudice exists."[14]

When Figueroa arrived in the emergency room, he identified himself as Seku Montana-Linares and provided a driver's license with his picture and the Seku Montana-Linares name. He signed both his consent to treatment and his discharge from the emergency room with that alias. In his deposition, he revealed that he did this because he had an outstanding bill at the hospital and was worried that they would not treat him. He also stated that he used the false driving license because his license had been suspended for driving under the influence of an intoxicant. Figueroa moved in limine to exclude any evidence of this alias.

Figueroa argued that the evidence had marginal relevance and was unfairly prejudicial and would focus the jury on issues other than those being

---

[12] Salas, 168 Wn.2d at 671. ER 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
[13] Lodis v. Corbis Holdings, Inc., 172 Wn. App. 835, 863, 292 P.3d 779 (2013).
[14] Salas, 168 Wn.2d at 671.

litigated. The trial court granted the motion in limine and redacted Figueroa's signature from the two medical records.[15]

At trial, Figueroa testified that the signature on the medical records at the time of discharge was similar to the signature he signed on the admission record. Dr. Ryan moved to reconsider the trial court's decision redacting the signatures, arguing that the similarity of the signatures constituted objective evidence directly negating Figueroa's testimony regarding the swelling in his hand and his inability to use his fingers. Dr. Ryan argued that even though Figueroa admitted that his signature on the admitting and discharge papers were identical, it was still necessary to introduce the signature evidence. Figueroa contended that the admission of the signatures was duplicative of the testimony regarding the similarity of signatures and that the testimony itself was sufficient for Dr. Ryan to argue that the similarities of the signatures was contrary to Figueroa's testimony that his hand was significantly swollen. The court found that there was still substantial prejudice to the admission of these documents that outweighed any incremental additional probative value that these documents might have had. The court, without objection from Figueroa, permitted Dr. Ryan to elicit testimony from Rosa that the signatures look substantially the same.

Nor is there any merit to Dr. Ryan's argument that the jury's request for missing medical records was specifically directed at the missing signatures. After the court initially responded that the jury had all the records, both counsel discovered that some medical records were indeed missing. This was corrected

---

[15] The exclusion of the driver's license is not at issue in this appeal.

and those records were sent back to the jury room. Dr. Ryan's assertion that the jury's request was related to the missing signatures is speculative and not supported by the record. The court's rationale for excluding the evidence was reasonable.

Dr. Ryan also asserts that the missing signatures violated the rule of completeness as set forth in ER 106.[16] Under ER 106, if a party introduces a statement, an adverse party may require the party to introduce any other part of that statement, "which ought in fairness to be considered contemporaneously with it." However, the evidence must be relevant to the issues in the case, and "the trial judge need only admit the remaining portions of the statement which are needed to clarify or explain the portion already received."[17] Here, whether or not there is a signature on the medical records is not necessarily needed to explain or complete the documents.

Expert Testimony

Dr. Ryan argues that the trial court improperly admitted Dr. Ken Zafren's opinion testimony on the standard of care and proximate cause. The admission or exclusion of expert testimony is discretionary with the trial court. Expert testimony is generally required to establish proximate cause in a medical

---

[16] ER 106 provides:
> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the party at that time to introduce any other part, or any other writing or recorded statement, which ought in fairness to be considered contemporaneously with it.

[17] State v. Larry, 108 Wn. App. 894, 910, 34 P.3d 241 (2001) (citing United States v. Velasco, 953 F.2d 1467, 1475 (7th Cir. 1992)).

malpractice suit.[18]  Here, the trial court permitted Dr. Zafren to testify regarding causation.

Dr. Zafren testified that Dr. Ryan breached the standard of care by not diagnosing the compartment syndrome, by not giving proper discharge instructions, and by not requesting a surgical consult.  In reaching his decision, Dr. Zafren testified that he relied on the medical records, and the depositions of the Figueroas, Dr. Ryan, and Dr. Ryan's expert, Dr. Ronald Dobson.

Dr. Zafren testified that in cases of extravasations, adverse outcomes resulting in compartment syndrome occurred in instances where the amount of fluid released was 50 to 60 milliliters.  Here, the nurse's notes indicated that approximately 60 milliliters of intravenous contrast dye infiltrated during the test.  The nurse observed swelling in the right hand and notated that Figueroa complained of pain radiating to the mid-forearm and that continued monitoring would be done.  These notes were made at 3:40 p.m.  Figueroa returned to the emergency room from the radiology department still experiencing a great deal of pain for which he was given 125 milligrams of Demerol at 4:20 p.m.  Dr. Zafren testified that this dosage was significant and would decrease pain from any cause, yet Figueroa was still experiencing some pain.  Dr. Zafren testified that his review of the medical charts did not show anything that would suggest that the doctor had conducted an examination of Figueroa's arm.  The only medical notation, regarding the arm, was made by a nurse indicating that at 4:45 p.m., Figueroa experienced relief from the injection and that swelling was decreasing

---

[18] Harris v. Robert C. Groth, M.D., Inc., P.S., 99 Wn.2d 438, 449, 663 P.2d 113 (1983).

in the fingers with Figueroa stating that he could move his fingers. Dr. Zafren testified that one reason a person does not move their fingers is because it causes pain. Because Figueroa had received a significant dose of pain medication, his ability to move his fingers was related to less pain, not necessarily because the swelling was going down. Figueroa was discharged at 5:28 p.m., an hour after having received the Demerol. Dr. Zafren opined than an hour was an insufficient amount of time to observe an extravasation injury because compartment syndrome evolves over a period of time. Further observation should have occurred because the golden time within which to treat compartment syndrome is six hours before irreversible tissue damage would occur. Here, the surgery was not performed until eight hours after the original injury.

In reviewing the discharge instructions, Dr. Zafren opined that the instruction that "your symptoms should improve within 24-hours of treatment" was intended for the abdominal pain. Dr. Zafren testified that a more appropriate instruction would inform the patient that he should return to the emergency room within a certain amount of time "if not improved and immediately if your condition is getting worse." Dr. Zafren testified that the written discharge instructions did not meet the standard of care because there was nothing in them relating to the treatment for extravasation, should complications occur.

Outside the presence of the jury, the court addressed whether Dr. Zafren was sufficiently qualified to render an opinion on the issue of proximate cause. Dr. Zafren testified that he reviewed the records of Dr. Muoneke, who performed

the fasciotomy and follow-up care for Figueroa. Dr. Zafren testified to a reasonable degree of medical certainty that Figueroa might not have experienced the problems that were documented in Dr. Muoneke's medical records had he received the appropriate care within the six hour time frame.

In its ruling permitting the testimony, the court stated:

> My ruling is I am going to allow the testimony. I think that the points made by the defense primarily go to the weight of the testimony. I recognize at this time is a close call. I would also note that there is no claim of unfair surprise, because he did testify to this at his deposition, even though that the defense didn't concede that he was competent to give that testimony.

Both parties stipulated to the admission of Dr. Muoneke's medical records on his treatment of Figueroa. Those records indicated that Dr. Clark's observations of Figueroa were in agreement with Dr. Muoneke that the lapse of time between the extravasation when compartment syndrome began and when Figueroa went into surgery to correct the problem. This was sufficient to establish causation. There was no error.

Jury Instruction

Dr. Ryan argues that the trial court erred in not giving WPI 105.08.[19] As noted in Ezell v. Hutson, "Jury instructions are sufficient if they allow the parties to argue their theories of the case, do not mislead the jury and, when taken as a whole, properly inform the jury of the law to be applied."[20] We review de novo

---

[19] 6 WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 105.08 (6th ed. 2012).
[20] 105 Wn. App. 485, 488, 20 P.3d 975 (2001) (internal quotation marks and citations omitted).

whether an instruction is an error of law.[21] But, the giving of a particular instruction is reviewed for an abuse of discretion.[22]

The "error of judgment" instruction found at WPI 105.08 is used to supplement the standard of care instruction and should be given with caution and "be limited to situations where the doctor is confronted with a choice among competing therapeutic techniques or among medical diagnoses."[23] The instruction proposed by Dr. Ryan reads as follows:

> A physician is not liable for selecting one of two or more alternative courses of treatment and/or diagnoses, if, in arriving at the judgment to follow a particular course of treatment and/or make a particular diagnosis the physician exercised reasonable care and skill within the standard of care the physician was obliged to follow.

Dr. Ryan argues that this instruction was proper because he and his expert both testified that the exercise in judgment in deciding to discharge Figueroa under the circumstances was reasonable because of the symptoms presented upon return from the radiology department. But this is different from a situation where the physician has a choice among different therapeutic techniques. The issue was whether Figueroa had acquired compartment syndrome and whether Dr. Ryan exercised reasonable care in his diagnosis or discharge instructions. Here, no written discharge instructions were given relating to extravasation or the need to immediately return if continued or worsening pain occurred. There is no dispute about which discharge instruction should have been given.

---

[21] Ezell, 105 Wn. App. at 488.

[22] Thomas v. Wilfac, Inc., 65 Wn. App. 255, 264, 828 P.2d 597 (1992).

[23] Watson v. Hockett, 107 Wn.2d 158, 165, 727 P.2d 669 (1986).

The jury instructions as given informed the jury of the applicable law and presented Dr. Ryan with the opportunity to argue his theory of the case. Dr. Ryan's instruction does not fit the facts presented in this case and would have confused the jury because it is not clear that the treatments advocated by the experts were alternative choices or that there were only two choices available to administer to the patient.[24]

The instructions set forth the burden of proof that Figueroa needed to establish, including whether Dr. Ryan failed to follow the applicable standard of care.[25] Thus, Dr. Ryan was able to argue that he gave the appropriate standard of care in this situation. There was no error.

New Trial

Dr. Ryan argues that the court erred in not granting a new trial because of alleged juror and attorney misconduct. Dr. Ryan further argues that the trial court abused its discretion when it denied his motion for a new trial after a juror posted comments regarding the case on Facebook. A juror's communication with a third party about a case constitutes misconduct.[26] The trial court may grant a new trial only where such juror misconduct has prejudiced the defendant.[27]

---

[24] Nelson v. Mueller, 85 Wn.2d 234, 238-39, 533 P.2d 383 (1975) (There is no error in refusing to give an instruction where the proponent of such instruction adequately argued their theory to the jury.)

[25] Ezell, 105 Wn. App. at 488.

[26] State v. Depaz, 165 Wn.2d 842, 858-59, 204 P.3d 217 (2009).

[27] State v. Earl, 142 Wn. App. 768, 774, 177 P.3d 132 (2008).

Here, no such prejudice was shown. The juror's comments were limited and innocuous. They were nothing more than a description of the juror's day interspersed with the following related comments on her jury duty:

- Spent the day in Superior Court doing my civic duty. On jury duty for next 2 weeks.
- Day 3 of jury duty. Very difficult to listen to a translator during the questioning. I can pick out some words.
- Day 4 of jury duty, off on Friday, and back to the jury on Monday. Hope to finish by noon on Thursday. It's been interesting. Love the 1 ½ hour lunches.
- My civic duty, jury duty ended today with a negligent claim on the doctor. This was tough to decided $s to the plaintiffs. Mentally exhausting!

While it was inappropriate for the juror to post anything on Facebook regarding the case, these comments were not prejudicial to Dr. Ryan.[28]

During closing argument, Figueroa's counsel referred to the facts of an unrelated case in which a physician, Dr. Charles Momah, sexually abused patients while they were under anesthetic. Dr. Ryan objected and the court sustained, striking any reference to the unrelated sex abuse case. A jury is presumed to follow a court's instruction.

On appeal, Dr. Ryan also objects to additional comments of Figueroa's counsel, but failed to make any objections thereto. Dr. Ryan takes the statements out of context and mischaracterizes those comments as racist, picking and choosing certain portions of the argument. When the argument is read in its entirety, it does not convey racist overtones.

---

[28] See State v. Theobald, 78 Wn.2d 184, 186, 470 P.2d 188 (1970) (juror's question to a witness on a trip to the crime scene, held not to be prejudicial, where such question and answer were unrelated to an important issue in the case and produced no evidence different from the in-court testimony).

15

The trial court did not abuse its discretion in any of its rulings.  We affirm the judgment of the trial court.

WE CONCUR: