# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )     NO. 71820-7-I
                               )
           Respondent, )
                               )     DIVISION ONE
       v.                         )
                               )
CRAIG CHARLES BROWN, )     UNPUBLISHED OPINION
                               )
          Appellant. )     FILED: July 20, 2015
_____)

LAU, J. – During Craig Brown's trial for attempted commercial sexual abuse of a minor, the trial court denied his motions for a mistrial and excluded hearsay statements he made during a police interrogation. Because those rulings were within the court's discretion, and because Brown's remaining arguments are either raised for the first time on appeal, without merit, or not supported by the record, we affirm.

## FACTS

Based on allegations that Brown took a substantial step toward having paid sex with an undercover officer posing on the internet as a 15-year-old girl, the State charged him with attempted commercial sexual abuse of a minor.

No. 71820-7-I/2

At trial, Detective Tye Holland of the Seattle Police Department vice unit testified that his work included the solicitation of juvenile prostitutes through the internet. Posing as a 15-year-old girl, he would post advertisements for sex on internet sites like Craigslist. The initial ad would not state the advertiser's age because an ad posted by a 15-year-old looking for a sexual encounter would be removed as illegal. After initial correspondence with interested persons, he would claim to be 15-years-old. This weeded out people who were only interested in sex with an adult. He would then agree to meet persons interested in sex with the fictitious 15-year-old. Police would arrest the interested person when they arrived at the meeting place.

On September 17, 2013, at approximately 9 p.m., Detective Holland placed the following advertisement in the "Casual Encounters" section of Craigslist:

> Student looking for older men -w4m (anywhere). Just as the title says. Cute young girl interested in NSA sex. Email me. Please don't be judgmental. I am fun sexy and aim to please.

Exhibit (Ex.) at 1.

At 9:34 p.m., Brown responded under the name Brian Jacobs, stating:

> [T]his is a long shot. I am a 43 yo white male in Bremerton. When are you available[?] Just so I know, what does it take for men to satisfy you, are you just more comfortable with them? Also, where are you located?

Ex. 2 at 1.

-2-

No. 71820-7-I/3

Detective Holland, writing under the name "Jen jen," replied: "U sound great. I just love sex with older men. I charge by sex act not time. I do oral sex, regular sex [and] anal sex . . ." Ex. 1 at 1.

Brown asked where Jen jen was located, how often she was available, and what she charged. When Jen jen indicated she was in high school, Brown asked:

> How old are you? If you are under 18 please quit immediately. I will not destroy my life for underage sex. Please tell me your age. I hope you have proof if you are 18.

Ex. 2 at 3. Jen jen responded, "I am not 18. Sorry." Brown replied:

> You are capable of really hurting someone who has sex with you. It could totally wreck their life. They will have to be registered as a sexual predator. It will be hard for them to get a good job, and a girlfriend.
>
> Are you looking for money or just the excitement? I will not have sex with you, but am willing to help you. If you don't mind, tell me a little bit about yourself. Maybe I can help.

Ex. 2 at 4.

When Jen jen failed to respond, Brown sent more messages, stating "I am hoping we can write to each other knowing we will not meet" and "[p]lease don't give up on me, I am hoping you write back again." Ex. 2 at 6. Jen jen replied "I don't need pity. I am consenting and I like doing what I do." Ex. 2 at 7. Brown said "Can I meet you? What would I have to do to meet? I am super curious to find out what you look like. Is this weekend possible?" Ex. 2 at 7. Jen jen stated "I only meet for sex" and attached a picture of herself in a bikini.

Brown again asked for her age, stating that the "[a]ge for consent in Washington is 17." Ex. 2 at 8. Jen jen corrected him, stating "It is 16 actually" and "I am 15." Ex. 2 at 9. Brown then said "I am being serious, do you really want to meet up with me? I want to meet you!" Ex. 2 at 9. Jen jen responded "I am serious I don't lie. I only meet for sex. I am very discrete." A few minutes later, Brown asked "would you like to meet this weekend?" Jen jen wrote back "Ya but u said u were not interested." Ex. 2 at 10. Brown replied: "I want to have the experience of being with you. I am getting to know you, and I want more!!!!" Ex. 2 at 10.

Later, Brown asked whether Jen jen was "involved in . . . law enforcement" because he was "trying to protect himself." Ex. 2 at 11. He asked again if she was available that weekend. Jen jen said she might be and asked, "[w]hat do you want sex wise. I do oral sex, regular sex and anal sex. Let me know so I can give u price." Ex. 2 at 13. Brown told her "regular sex to start." Ex. 2 at 13. Jen jen said "OK I do regular sex for $100." Ex. 2 at 14. Brown said "I would love it."

The next morning, Brown messaged Jen jen and asked when she was turning 16. He thought they should wait if her birthday was "real close," otherwise he doubted he would want to wait. Ex. 2 at 17. She later told him her birthday was eight months away.

At another point, Brown asked Jen jen why she charged money and offered to send her cash, stating "[w]hat would it take for you to only do it with

me?" She said "once a week sex meets." He then said "I won't have sex until you are of legal age, but I can start with some money to build up a pot so that once you are legal we can go all out." Ex. 2 at 6. He said he "would absolutely love to have sex" with her but he needed to get to know her "much better before we engage." Ex. 2 at 5.

Jen jen responded: "OK I am done. I thought u wanted sex. Since u don't I am done communicating. I don't have time to waste. I am not a victim. I don't need charity." Brown then said "[p]lease don't give up on me. Is Tuesday ok?" Ex. 2 at 7. He also asked if she had "a safe place for sex or do I need to get a motel?" Ex. 2 at 8.

As they discussed the time and place of their meeting, Brown said "I still don't know what you like the best. I want to make sure this goes great to ensure you want to see me often. What do you like the best? Question: Are you able to spend a Friday night in a motel?" Ex. 2 at 10. During their exchanges, Brown asked Jen jen on three separate occasions for her "stats." Report of Proceedings (RP) (March 13, 2014) at 114. He also said that he "would much rather have a tight pussy" than anal sex and "[t]hat is one reason young girls would be popular." Ex. 2 at 1.

They eventually agreed to meet at a McDonalds restaurant in Seattle. Brown said he was "scared" and "our first encounter might just be to get to know each other. I just have to make sure I am not getting arrested tomorrow." Ex. 2 at 14. Jen jen told him "I don't do 'get to know meets' i don't have time for that. I

am trusting u and i expect trust. u already know this is safe and I am legit." Ex. 2 at 14. Brown responded "Sorry. I too am legit and am looking forward to tomorrow!" He subsequently expressed his excitement about "sharing our bodies." Ex. 2 at 16.

In the final message exchange preceding his arrest, Brown agreed to pay Jen jen $100 for oral and regular sex. He arrived at the McDonald's at the agreed upon time and was placed under arrest.

Brown consented to a search of his vehicle and cell phone. The phone contained message exchanges with Jen jen. Police also found $142 in cash in his wallet. Brown did not have any condoms, lubrication, or sex items in his possession.

Brown testified at trial and admitted on direct examination that he had been looking on Craigslist for someone to have sex with. Once he learned that Jen jen was 15-years-old, however, his intent changed from wanting sex to wanting to help her. He realized that she was "going to wreck somebody's life and her own life" and decided to help her. RP (March 13, 2014) at 29. He testified that he was concerned about her "personal destructive behavior" and that she might be suicidal. RP (March 13, 2014) at 54. He intended to learn her name, school and address so he could "go to the authorities to help her." RP (March 13, 2014) at 35. He testified that this was not out of character for him because he often helps strangers.

When asked on direct why he asked Jen jen whether she was affiliated with law enforcement, Brown answered "[t]hat is standard protocol on the internet. Anytime . . . you are meeting somebody else, if it's going to be for money you ask them are you law enforcement." RP (March 13, 2014) at 36.

On cross-examination, defense counsel asked Brown "How did you learn that [standard] protocol?" RP (March 13, 2014) at 79. After a recess during which the court told Brown he could not mention hearsay statements he made in his police interrogation, Brown testified "I went on Craigslist often, and I was looking for prostitutes to help. In three months I gave over $4,000 to different prostitutes to keep them out of prostitution." The prosecutor then asked: "So when you testified earlier that you were [on Craigslist] to meet somebody for sex, was that a lie?" RP (March 13, 2014) at 83. Brown said it was but admitted having previously paid for sex with a person he met on the internet. He claimed that he now used the internet only to help prostitutes. He admitted he had not told his wife about this activity.

During a lunch recess, defense counsel moved for a mistrial, arguing that the prosecutor's questions about internet protocol and Brown's answers about past dealings with prostitutes went beyond the scope of direct and violated a pretrial ruling. Defense counsel also said he had been ineffective for failing to immediately object to the questions. Counsel added that "I didn't open the door. Mr. Brown didn't open the door." RP (March 13, 2014) at 98. The prosecutor disagreed, stating:

-7-

> Mr. Brown testified to a protocol that he claimed existed on the internet. I absolutely have to be able to ask him about that. I did ask him. His answer was I have been trying to help people. He brought up the fact that he had engaged in prior prostitution. He -- I didn't ask him that question. I asked him how did you learn about this, and he said I have been working on the internet trying to help them. He brought it up that he engaged in prostitution. Following that was the discussion about spending all of the money. He brought up that too. He could have answered I -- I spend time on the internet trying to help them. . . That's a stupid move on his part.
>
> But from the perspective of whether or not a mistrial should be granted, there is absolutely no basis for that. He brought up the 404(b), if you can call it that. But I have to be able to challenge his credibility on an issue where he is claiming that there is a protocol on the internet. I should be able to ask him where that came from. So I don't see any basis for this at all.

RP (March 13, 2014) at 98-99.

In denying the mistrial motion, the court stated in part that the topic of internet protocol "came from your client, and I believe the State had a right to ask about that." RP (March 13, 2014) at 101. The court also denied defense counsel's alternative request to admit hearsay statements Brown made to police concerning his efforts to help prostitutes.

When cross-examination resumed, Brown testified that he needed to meet Jen jen because he didn't have enough information about her identity to get help for her. The prosecutor asked why Jen jen's e-mail address, phone number, and photograph were not enough. Brown responded, "I had tunnel vision. . . . When I look in hindsight . . . you are absolutely correct." RP (March 13, 2014) at 111. The prosecutor also tried to clarify whether Brown was online to find sex or to help people. Brown responded, "We-my wife and I talked about that during

lunch, and we are going to say it was a combination of the two." RP (March 13, 2014) at 121.

During closing argument, the prosecutor made the following remarks:

Well, Tye Holland . . . goes online and posts these ads, and then waits for this swarm to respond. 80 responses in under an hour. 80 responses. Okay. So Tye is standing there online waiting for these guys to come in. And they do en mass. If you didn't know about this issue before, you probably learned something during the course of this trial about what's going on. And now you have a sense of why. Maybe wondering where the police would do a sting. Well, now you know. Why Detective Holland is out there.

RP (March 13, 2014) at 135. Following closing arguments, defense counsel moved for a mistrial, arguing that the prosecutor's remarks amounted to an improper "call to community action," "to do the right thing," and "[t]o protect the community." RP (March 13, 2014) at 159. The court disagreed and denied the motion.

The jury convicted Brown as charged. He appeals.

### DECISION

#### Prior Bad Acts/Mistrial/Open Door

Brown first contends the court abused its discretion in denying his first motion for a mistrial. "As a general rule, the trial courts have wide discretionary powers in conducting a trial and dealing with irregularities which arise. A mistrial should be granted only when . . . the defendant has been so prejudiced that nothing short of a new trial can insure that [the] defendant will be tried fairly." State v. Gilcrist, 91 Wn.2d 603, 612, 590 P.2d 809 (1979) (citation omitted). We will disturb a court's decision on a motion for mistrial only if the court abused its

discretion. State v. Balisok, 123 Wn.2d 114, 117, 866 P.2d 631 (1994). The trial court did not abuse its discretion in denying Brown's first mistrial motion.

Brown maintains "the prosecutor had no valid reason" to ask him how he knew that asking potential sex partners about their affiliation with law enforcement was standard protocol on the internet. According to Brown, his prior experience paying for sex was inadmissible under ER 404(b). But as the State correctly points out, otherwise inadmissible evidence may be admitted where the defendant opens the door to it on direct examination. State v. Warren, 134 Wn. App. 44, 65, 138 P.3d 1081 (2006), aff'd on other grounds, 165 Wn.2d 17, 195 P.3d 940 (2008); State v. Berg, 147 Wn. App. 923, 939, 198 P.3d 529 (2008). The "open door" doctrine promotes fairness by preventing one party from raising a subject and then barring the other party from further inquiry. State v. Avendano-Lopez, 79 Wn. App. 706, 714, 904 P.2d 324 (1995) (quoting State v. Gefeller, 76 Wn.2d 449, 455, 458 P.2d 17 (1969)). "It would be a curious rule of evidence which allowed one party to bring up a subject, drop it at a point where it might appear advantageous to him, and then bar the other party from all further inquiries about it." State v. Gefeller, 76 Wn.2d 449, 455, 458 P.2d 17 (1969). Here, Brown opened the door to the prosecutor's questions when he testified on direct examination that it is "standard protocol on the internet" to ask someone you're meeting for sex if they're affiliated with law enforcement. RP (March 13, 2014) at 36.

Brown next contends the court should have "granted defense counsel's alternative request to admit portions of the video interrogation" in which he gave the detectives names and phone numbers of prostitutes he had paid to stop having sex for money. Appellant's Br. at 14-15. He claims the exclusion of this evidence violated his constitutional right to present a defense. But the right to present a defense does not extend to irrelevant or inadmissible evidence. State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010); State v. Wade, __ Wn. App. __ , 346 P.3d 838, 846 (2015). Brown sought to admit his interrogation statements to corroborate his testimony that he sometimes solicited prostitutes solely to help them. The statements were thus offered for the truth of the matter asserted and were hearsay. Although Brown argued below that the statements were admissible as prior consistent statements, the court correctly rejected that argument on the ground that the statements were made after Brown had a motive to fabricate. State v. McCarthy, 178 Wn. App. 90, 312 P.3d 1027 (2013).

For the first time on appeal, Brown argues that the statements were not hearsay if offered to attack the adequacy of the officers' investigation. Under that theory, the statements would be offered not for their truth, but to show that the officers had leads they did not pursue. Brown's counsel, however, did not offer the evidence for that purpose below. An appellant generally cannot argue a new theory of admissibility for the first time on appeal. State v. Goebel, 36 Wn.2d 367, 378, 218 P.2d 300 (1950) (new ground for admission of evidence generally will not be entertained for the first time on appeal); State v. Riley, 121 Wn.2d 22, 31,

846 P.2d 1365 (1993) ("Arguments not raised in the trial court generally will not be considered on appeal."); Makoviney v. Svinth, 21 Wn. App. 16, 27, 584 P.2d 948 (1978). The exclusion of the video interrogation did not violate Brown's right to present a defense.

Brown also argues that his rejected offer to take a polygraph was not hearsay because it showed the inadequacy of the investigation. He contends the exclusion of this evidence violated his right to present a defense. But Brown's trial counsel did not oppose the State's motion to exclude the evidence, saying "I'm not going to be covering [that] so I have no objection to the State's request." RP (March 13, 2014) at 46. Nor did defense counsel argue that the evidence was admissible to show the inadequacy of the investigation. In any event, offers to take polygraphs are generally inadmissible and Brown cites no authority supporting the proposition that the rejection of such an offer is probative of the adequacy of an investigation. See State v. Rowe, 77 Wn.2d 955, 958-59, 468 P.2d 1000 (1970) ("since it is generally held that polygraph tests are not judicially acceptable, it is obvious that a defendant should not be permitted to introduce evidence of his professed willingness to take such a test. At best such an offer is a self-serving act or declaration which is made without any possible risk. If the offer is accepted and the test given, the results cannot be used in evidence whether they were favorable or unfavorable. In short, a defendant has everything to gain and nothing to lose by making the offer, so the conduct

underlying the so-called inference of innocence can well be feigned, artificial and wholly unreliable.").

Finally, Brown contends the video image of the shirt he wore at the time of his arrest was not hearsay. The shirt's logo said "Foster Parents Association of Washington State." Appellant's Br. at 17. Brown contends the shirt was "simply a physical piece of evidence, entirely outside of the hearsay rules." Appellant's Br. at 18. But again, Brown's counsel did not offer the shirt as evidence below and Brown does not contend his counsel was ineffective for failing to do so.

## Prosecutorial Misconduct/Mistrial

Brown contends the prosecutor committed misconduct by eliciting testimony about police operations involving child prostitution and highlighting that evidence in closing argument. He claims this amounted to "irrelevant and prejudicial testimony and argument about the police crusade against child prostitution." Appellant's Br. at 18. He concedes there were no contemporaneous objections, but contends the issues were preserved by his post-verdict motion for a mistrial. He further contends the prosecutor's misconduct is reviewable despite the lack of objections because it was flagrant and ill-intentioned.

Although the issue was preserved in Brown's mistrial motion, the court did not abuse its discretion in denying the motion. The court ruled as follows:

> I think the issue is whether on the one hand the background
> information, the testimony by the detective, and also the closing
> argument by the State, was intended to provide some context for
> the jury so that they can understand why these sting operations

> occur. I don't think there is any question that the State can do that because I think there are some jurors who are offended by sting operations, and that would be completely legitimate. It would not be legitimate would be to say convict Mr. Brown because child prostitution is a horrible thing, and you need to convict him in order to prevent this kind of crime to save children. I didn't hear that in the closing argument. I did didn't hear anything that inflamed the passion of the jury. So I'm going to deny the motion for a mistrial.

RP (March 13, 2014) at 161-62.

This reasoning is sound. The State is generally entitled to submit evidence concerning a police witnesses' experience and the nature of, and reason for, the operation that resulted in a defendant's arrest. See, e.g., State v. Perez-Arellano, 60 Wn. App. 781, 784, 807 P.2d 898 (1991) ("The average juror has little or no knowledge or understanding of police drug operations and may well wonder whether it is appropriate, or even legal, for police to hide in tall buildings, watch people, and then arrest them when they engage in illegal conduct. Testimony explaining why a particular area was chosen for observation is therefore relevant to explain the circumstances of an arrest."). The challenged evidence generally served these purposes.

Contrary to Brown's assertions, the prosecutor's argument in closing did not amount to "an improper call to community action." Appellant's Br. at 20. The prosecutor simply reminded the jury of the reason for the sting operation.[1]

---

[1] This concern evidently arose during voir dire. The prosecutor reminded the court during argument on the mistrial motion that there were concerns:

> "[I]n voir dire . . . about police stings. I feel like it's my obligation to try to emphasize to the jury why these are necessary because I don't want them hanging up because they don't like police action . . . . So I feel like I have . . . to make my best argument as to why

The court did not abuse its discretion in denying Brown's second motion for mistrial.

For essentially the same reasons, the prosecutor did not commit flagrant and ill-intentioned misconduct warranting review of his alleged improper actions for the first time on appeal. State v. Emery, 174 Wn.2d 741, 760–61, 278 P.3d 653 (2012) (in the absence of an objection, alleged prosecutorial misconduct is reviewable only if it was so flagrant and ill-intentioned as to be incurable.).

## Ineffective Assistance of Counsel

Brown next contends his trial counsel was ineffective for failing "to timely object to the testimony and argument which led to his motions for a mistrial." Appellant's Br. at 22. To prevail on an ineffective assistance claim, Brown must establish both deficient performance and prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. McFarland, 127 Wn.2d 322, 334–35, 899 P.2d 1251 (1995). We strongly presume that counsel provided effective assistance. State v. McNeal, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). Performance is deficient when it falls below an objective standard of reasonableness. State v. Horton, 116 Wn. App. 909, 912, 68 P.3d 1145 (2003). Conduct that can be fairly characterized as a legitimate trial tactic is not deficient. State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). The prejudice requirement is satisfied if there is "a reasonable probability that, but for

---

they should not be wound up about police going out there and doing stuff like this."
RP (March 13, 2014) at 159-60.

counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Where ineffective assistance claims involve matters outside the record, they must be raised in a personal restraint petition. McFarland, 127 Wn.2d at 335.

For the reasons set forth above, defense counsel's failure to object immediately to the evidence and argument about police efforts to address juvenile prostitution, and to the questions about Brown's knowledge of "internet protocol," was not deficient performance.

Brown also contends his counsel was ineffective for "failing to present testimony of numerous witnesses who could confirm that [he] was unusually inclined to help strangers." Appellant's Br. at 22. Quoting letters submitted by these witnesses at sentencing, Brown claims the witnesses could have testified to his good character and that their testimony would have been admissible under either ER 404(a)(1) ("[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same") or ER 406 ("Evidence of the habit of a person . . . whether corroborated or not . . . is relevant to prove that the conduct of the person . . . on a particular occasion was in conformity with the habit or routine practice."). He contends his trial counsel "very likely . . . could have proved his reputation and habit at trial, . . . that this proof would likely have changed the result," and that counsel "could not have been following a

reasonable trial strategy" in declining to present these witnesses at trial. Appellant's Br. at 30 and Appellant's Reply Br. at 4.

But the State points out, and Brown does not dispute, that the letters fall short of describing the "semi-automatic, almost involuntary and invariabl[y] specific responses to fairly specific stimuli" required for habit evidence under ER 406. Washington State Physicians Ins. Exchange & Ass'n v. Fisons Corp., 122 Wn.2d 299, 325, 858 P.2d 1054 (1993) (internal quotation marks and citations omitted); State v. Thompson, 73 Wn. App. 654, 659 n.4, 870 P.2d 1022 (1994) ("[H]abit describes one's regular response to a repeated specific situation so that doing the habitual act becomes semi-automatic. It is the notion of the invariable regularity that gives habit evidence its probative force.").

And as the State points out, the evidence would be admissible under ER 404(a) only if it was presented in the form of reputation testimony. ER 405(a). Brown does not dispute this point and concedes that "the sentencing letters did not necessarily speak in terms of 'reputation' rather than specific acts." Appellant's Br. at 4. In addition, the sentencing letters were not sworn statements, and the record is silent as to whether the witnesses were willing to make these same statements under oath. The record is also silent as to whether counsel was aware of the witnesses and their opinions prior to trial. Finally, the record does not indicate whether the presentation of such evidence might have

resulted in the presentation of damaging rebuttal evidence.[2] See State v. Fisher, 130 Wn. App. 1, 17, 108 P.3d 1262 (2005) ("By relating a personal history supportive of good character, a defendant may be opening the door to rebuttal evidence along the same line."). On this record, we cannot say Brown has carried his burden of overcoming the strong presumption of effective assistance of counsel.[3]

Affirmed.

WE CONCUR:

---

[2] In this regard, we note that whether a witness should be called is generally a matter of trial tactics so long as counsel investigated the case and made an informed decision and reasonable decision. State v. Jones, No. 85236-7, 2015 WL 3646445 (Wash. June 11, 2015).

[3] In his reply brief, Brown acknowledged these potential problems with the record, stating:

> In the alternative, if this Court finds that the sentencing letters do not supply competent proof that exculpatory evidence could have been presented at trial, Mr. Brown should have the opportunity to revisit the issue in a personal restraint petition. He could then obtain and present declarations from witnesses specifically focusing on the standards for reputation and habit evidence." Appellant's Reply Br. at 4-5.