[No. 48870–3.   En Banc.   April 28, 1983.]

BARBARA HARRIS, ET AL, *Petitioners,* v. ROBERT C.
GROTH, M.D., INC., P.S., ET AL,
*Respondents.*

*Olwell, Boyle & Hattrup,* by *Lee Olwell* and *Wayne R. Parker,* for petitioners.

*Williams, Lanza, Kastner & Gibbs,* by *Craig E. Kastner,* for respondent Groth.

*Merrick, Hofstedt & Lindsey, P.S.,* by *Gary R. Eliasen* and *Sidney R. Snyder, Jr.,* for respondent Lindblad.

UTTER, J.—This is a medical malpractice action which presents two issues. The first, an issue which has received great attention in the past decade, is whether the conduct of a health care provider is to be measured against the standard of care practiced by the profession or against a standard of reasonable prudence. The second issue is whether a nonphysician may give expert medical testimony in a malpractice action. We hold that, as enacted by the Legislature, the standard of care imposed upon health care providers is one of reasonable prudence and that nonphysicians, if otherwise qualified, may give expert testimony in a medical malpractice case. Nonetheless, we affirm the trial court's refusal to give plaintiff's reasonable prudence instruction in the present case because it was not properly framed. We also affirm its limitation of nonphysician expert testimony as within its discretion to evaluate the qualifications of a proffered expert.

The plaintiff, Barbara Harris, has an intermittent history of an eye disease known as iritis. In November 1976, she had another attack and went to see the defendant physician, Robert Groth, on November 8. She saw him weekly through November 30, at which time her visits stopped.

As treatment for Ms. Harris' iritis, Dr. Groth prescribed topical corticosteroids (eyedrops) and systemic corticosteroids (pills). He also prescribed a drug called atropine

in topical form. Ms. Harris claims that she faithfully took these medications at least through March 1977, though Dr. Groth claims she could not have continually taken the systemic corticosteroids during this period because she did not have enough prescribed.

In January 1977, Ms. Harris began to see flashing lights, wavy lines, and spider webs. She went to see Dr. Walter Topinka, one of Dr. Groth's associates, and he gave her an eye injection. Her visual problems continued, however, and in February Ms. Harris began to feel pressure centered in her right eye. She saw Dr. Groth on February 14 and he increased her medication. Despite this, the pain grew worse and Ms. Harris visited Dr. Groth again on March 8 and March 14. On March 18, Ms. Harris, in still worse pain, made an emergency visit to Dr. Arthur Wilson, another associate of Dr. Groth. Dr. Wilson tested Ms. Harris' intraocular pressure,[1] found it to be extremely high, and diagnosed an acute glaucoma attack. (Glaucoma is an increase in fluid pressure in the eye which may result in damage to the optic nerve.) Ms. Harris was rushed to the hospital, where she underwent emergency eye surgery. Since that time, she has been hospitalized with eye problems on several more occasions and has suffered a severe deterioration in her vision with attendant psychological problems.

At trial, Ms. Harris sought to develop several theories of negligence. One was based on the fact that Warren's Drugs, the drugstore owned by defendant Warren Lindblad, mistakenly provided Ms. Harris with a drug called Isopto–Carpine rather than the atropine actually prescribed. While atropine helps cure iritis by dilating the pupil, Isopto–Carpine constricts the pupil. For this reason, Isopto–Carpine should not be used by a patient with iritis.

Ms. Harris also sought to prove that Dr. Groth was negligent in failing to detect her glaucoma. Flashing lights and a feeling of pressure centered in the eye are common symptoms of glaucoma. In addition, steroids may induce glau-

---

[1] Intraocular pressure is the pressure of the fluid in the eye.

coma in a small number of susceptible persons. Two physicians testified that, because of this possibility, the intraocular pressure of any patient on steroids should be tested regularly. Yet at no time did Dr. Groth test Ms. Harris' intraocular pressure. The only time it was tested between November and March was when Ms. Harris visited Dr. Topinka in January. At that time it was normal.

Ms. Harris also produced physician testimony that her intraocular pressure was probably excessive when she visited Dr. Groth on March 8 and March 14, 1977, that a pressure test would have detected this, and that action could have been taken to save her vision on either of those dates. Ms. Harris offered additional testimony regarding these facts by Professor Fredric Harris, a physiologist not licensed to practice medicine, but the trial court ruled that he was not qualified to give such testimony. Professor Harris was also prevented from testifying generally about the causes of and methods of treatment and diagnosis of medical conditions such as glaucoma and, in particular, was prevented from testifying that he also believed that the intraocular pressure of a patient on steroids should be regularly tested.

Dr. Groth and Mr. Lindblad presented evidence countering that presented by Ms. Harris. Their evidence tended to prove that Ms. Harris' glaucoma attack was of a type known as closed–angle glaucoma which comes on in a matter of hours and would therefore not have been detected by intraocular pressure tests. Dr. Groth also sought to prove that his failure to perform pressure tests was not negligent.

The case was then submitted to the jury. The court ruled Mr. Lindblad negligent as a matter of law but refused to make such a ruling with respect to Dr. Groth. The court also refused to give several of Ms. Harris' proposed instructions, including her proposed instruction 5. That instruction read:

Irrespective of whether you find that defendant Groth met or failed to meet the applicable standard of care followed by practicing ophthalmologists in the diagnosis of

glaucoma, if you find that plaintiff Barbara Harris had glaucoma and that the statistical risk of sight loss from glaucoma is serious enough in cases such as Barbara Harris' that reasonable prudence under the circumstances required the administration of additional diagnostic tests before March 18, 1977, you are instructed that failure to perform those tests before that date would constitute negligence. In determining whether reasonable prudence would require giving the tests in question, you should consider, among other facts, the cost, ease or difficulty of administration, risk to the patient and relative reliability of the tests in question.

Clerk's Papers, at 36. Instead the court gave the traditional instruction stating the standard of care to be established medical practice.

The jury rendered judgment against Ms. Harris and she appealed on several grounds. The Court of Appeals, Division One, affirmed (*Harris v. Groth,* 31 Wn. App. 876, 645 P.2d 1104 (1982)) and Ms. Harris sought review by this court on the two issues noted above. Her petition for review did not raise any of the other issues raised before the Court of Appeals and those issues are thus not before us here. *See* RAP 13.7(b).

I

A

Traditionally, the standard of care demanded of physicians has been conformance to the standard of the profession. *See* 51 Wash. L. Rev. 167, 169 (1975); W. Prosser, *Torts* § 32, at 165 (4th ed. 1971). This contrasts with the rule applied in most negligence cases that compliance with custom, while strong evidence of reasonable care, is not dispositive. *See, e.g., Blood v. Allied Stores Corp.,* 62 Wn.2d 187, 193, 381 P.2d 742 (1963); W. Prosser, § 33, at 166–68.

In 1974, we broke with the traditional medical malpractice rule in *Helling v. Carey,* 83 Wn.2d 514, 519 P.2d 981, 67 A.L.R.3d 175 (1974). In that case, the defendant physician failed to perform a glaucoma test which was simple, harmless, and relatively inexpensive and which involved no

judgment factor. *Helling,* at 518. We held that, regardless of customary medical practice, reasonable prudence required that the test be given and that failure to give the test was negligence as a matter of law.

Our decision in *Helling,* as well as several concurrent decisions in other areas of medical malpractice law, aroused great controversy. Bohrnsen & Ryan, *Tort Law in Washington: A Legal Chameleon,* 11 Gonz. L. Rev. 73, 87–88 (1975). While some viewed *Helling* as limited to its own unique facts, others viewed it as generally applicable. *See* 51 Wash. L. Rev. 167, 175–76, 183–84 (1975). Apparently fearing the worst, health care providers sought aid from the Legislature in reversing what they viewed as an unjustified judicial intrusion into health care; however, other groups put up a stiff resistance. *See, e.g.,* Read, *Medical Malpractice Bill Drafted by Doctors,* Seattle Post–Intelligencer, Jan. 1, 1976, at A1. Out of the fray rose several bills which dealt exhaustively with most aspects of medical malpractice. *See* Laws of 1975, 2d Ex. Sess., ch. 56; Laws of 1975, 1st Ex. Sess., ch. 114; Laws of 1975, 1st Ex. Sess., ch. 35. One of those areas was the standard of care to be applied in actions for professional negligence. *See* Laws of 1975, 2d Ex. Sess., ch. 56, § 9, codified as RCW 7.70.040; Laws of 1975, 1st Ex. Sess., ch. 35, § 1, codified as RCW 4.24.290.

The language of these statutes is somewhat ambiguous. The prevailing view among the commentators has been that they were intended to overrule our decision in *Helling* and reestablish in toto the traditional standard of care. *See, e.g., Physicians and Surgeons: Standard of Care,* 15 Gonz. L. Rev. 931, 939–40 (1980); 51 Wash. L. Rev. 167, 168 (1975). In *Gates v. Jensen,* 92 Wn.2d 246, 595 P.2d 919 (1979), however, we rejected the contention that RCW 4.24.290 had overruled *Helling. Gates,* at 253. We noted that RCW 4.24.290 requires proof in a professional negligence action of failure to exercise the skill, care, and learning "possessed" by others in the profession rather than that

actually "practiced".[2] *Gates,* at 253–54. The distinction is particularly significant in light of the fact that the original bill, which was amended, used the word "practiced". *Gates,* at 253–54 (quoting House Bill 246, 44th Legislature (1975)).

## B

In *Gates,* it was unnecessary for us to construe the effect of the other standard of care provision enacted after *Helling,* RCW 7.70.040(1), for that provision applies only to causes of action arising after June 25, 1976. Its effect is squarely before us in the present case, however, for Dr. Groth did not even begin to treat Ms. Harris until November 1976.

RCW 7.70.040(1) provides that the plaintiff in an action for professional negligence must show that the defendant health care provider "failed to exercise that degree of care, skill, and learning expected of a *reasonably prudent* health care provider in the profession or class to which he belongs, in the state of Washington, acting in the same or similar circumstances". (Italics ours.) On its face this appears to establish a standard of reasonable prudence. While it is a reasonably prudent health care provider, rather than any reasonably prudent person, against which the defendant's conduct is to be measured, this qualification was also implicit in the standard established by *Helling* and *Gates.* Superior knowledge, skill, or training is always taken into account in the application of any reasonable person standard. W. Prosser, § 32, at 161; Restatement (Second) of Torts § 289(b) (1965).

The language of RCW 7.70.040(1) differs significantly from that used in our decisions prior to *Helling.* In those cases, we required proof that the defendant in an action for

---

[2]In pertinent part, RCW 4.24.290 reads as follows:

"In any civil action for damages based on professional negligence against . . . a physician . . . the plaintiff in order to prevail shall be required to prove by a preponderance of the evidence that the defendant or defendants failed to exercise that degree of skill, care and learning possessed by other persons in the same profession and that as a proximate result of such failure the plaintiff suffered damages . . ."

professional negligence did not exercise "the standard and degree of care and skill expected of the *average* medical or dental practitioner, in the class to which defendant belongs, acting in the same or similar circumstances." (Italics ours.) *Hayes v. Hulswit,* 73 Wn.2d 796, 797, 440 P.2d 849 (1968). The striking similarity of this language and RCW 7.70-.040(1) in almost every respect *except* use of the adjectival phrase "reasonably prudent", combined with the rule that the Legislature is presumed to be aware of this court's prior decisions *(see, e.g., Daly v. Chapman,* 85 Wn.2d 780, 782, 539 P.2d 831 (1975)) strongly suggests that the Legislature did not intend reversion to the standard of care required before *Helling.*

Dr. Groth focuses on the use of the word "expected" in RCW 7.70.040(1) and argues that this must mean "expected by the medical profession", *i.e.,* established medical practice. Nothing in the statute, however, suggests that this interpretation, rather than "expected by society", is the proper reading. It is society and their patients to whom physicians are responsible, not solely their fellow practitioners. *Cf. Keogan v. Holy Family Hosp.,* 95 Wn.2d 306, 318, 622 P.2d 1246 (1980) (quoting *Canterbury v. Spence,* 464 F.2d 772, 784 (D.C. Cir. 1972) (patient's right to give informed consent "demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves")).

Our conclusion that the Legislature intended to adopt a reasonable prudence standard of care is further supported by the legislative history of RCW 7.70.040. The bill of which it became a part, House Bill 1470, 44th Legislature (1975–76) (HB 1470), originally said nothing of the standard of care to be applied in actions for professional negligence. After consideration of the bill by the House of Representatives Judiciary Committee, however, a substitute version was reported which included the language now codified as RCW 7.70.040(1). *See* House Journal, 44th Legislature (1975–76), at 278–79; Substitute House Bill 1470, § 9, 44th Legislature (1975–76) (SHB 1470).

Immediately prior to the introduction of HB 1470, Representative Walt Knowles submitted a report to the House of Representatives from the Select Committee on Medical Malpractice, a special committee appointed to study the medical malpractice problem. *See* letter to members, House of Representatives from Walt O. Knowles, Chairman, Select Committee on Medical Malpractice (Jan. 16, 1976) (Knowles Letter). Attached to that report was a proposed bill which contained a section largely identical to RCW 7.70.040, except that it required exercise of only "that degree of care and skill expected of the *average* health care provider in the class to which he belongs, acting in the same or similar circumstances".[3] (Italics ours.) *See* proposed bill, section 8, attached to Knowles Letter. The report suggested that this bill be referred to an appropriate standing committee for further consideration. *See* Knowles Letter.

While the bill proposed by the Select Committee on Medical Malpractice was apparently never formally introduced as a separate bill, several facts indicate that the Judiciary Committee must have been aware of it. First, its language is very similar to that used in SHB 1470, except for the substitution of "reasonably prudent" for "average". *Compare* SHB 1470 *with* proposed bill, section 8, attached to Knowles Letter. Second, Representative Knowles was not only chairman of the Select Committee on Medical Malpractice but was also chairman of the Judiciary Committee and prime sponsor of HB 1470. *See* House Journal, 44th Legislature (1975–76), at 278–79. Third, copies of the Knowles Letter and the accompanying bill proposal are contained in Judiciary Committee files. *See* State Archives, Medical Malpractice Files, Judiciary Committee, House of Representatives.

---

[3]Interestingly, the language in this proposed bill tracks almost exactly the language we used in *Hayes v. Hulswit, supra*, and quoted above at page 444. This provides further evidence that the Legislature was aware of the language used in our pre–*Helling* cases.

This legislative history strongly suggests that the Legislature considered adopting an "average practitioner" standard and chose instead to adopt one of a "reasonably prudent practitioner". We cannot, and will not, override that choice by construing the two standards to be the same. The Legislature has chosen to impose upon health care providers the same standard of care as is imposed upon other members of society[4] and we must implement that choice.

## C

■ Since the law requires reasonable prudence of health care providers, Ms. Harris was entitled to a reasonable prudence instruction setting forth her theory that Dr. Groth should have tested her intraocular pressure. *See Egede–Nissen v. Crystal Mt., Inc.,* 93 Wn.2d 127, 135, 606 P.2d 1214 (1980). She was obliged, however, to provide the trial court with an instruction which correctly stated the law and was otherwise properly formulated. *See Egede–Nissen,* at 135. Moreover, the trial court was not under any obligation to revise her proposed instruction if she presented one which was improper. *See Juneau v. Watson,* 68 Wn.2d 874, 880, 416 P.2d 75 (1966).

For two reasons, the trial court properly rejected the particular instruction proposed by Ms. Harris. First, the instruction was overly broad. Second, it did not correctly state the law.

The instructions to be given in a particular case are governed by the facts proven in the case (*Allison v. Department of Labor & Indus.,* 66 Wn.2d 263, 267, 401 P.2d 982 (1965)) and instructions which are overly broad or which allow the jury to speculate as to the facts are improper. *See*

---

[4]The legislative history does, however, indicate an intent to alter existing law in one respect—by limiting those who set the standard of care to health care providers within the state of Washington. *See Legislative Report of the 44th Second Extraordinary Session* 23 (1976). Thus, in attributing to the reasonably prudent health care provider the skill and training possessed by members of the same class or profession (*see* RCW 4.24.290; W. Prosser, § 32, at 162), the trier of fact must consider only those providers within the state of Washington. *See* RCW 7.70.040.

*Grobe v. Valley Garbage Serv., Inc.,* 87 Wn.2d 217, 221, 551 P.2d 748 (1976); *White v. Burke,* 31 Wn.2d 573, 583, 197 P.2d 1008 (1948). Here, the instruction proposed by Ms. Harris allowed the jury to speculate as to *any* "additional tests" which Dr. Groth might have given, despite the fact that Ms. Harris' theory of the case focused solely on the need for an intraocular pressure test. While we approved the use of such an instruction in *Gates v. Jensen, supra,* that case involved different facts. In particular, there was evidence in *Gates* that at least two additional diagnostic tests might have been performed. *Gates,* at 253. A broader instruction was therefore justified in *Gates.* In the present case, however, the instruction should have limited the jury to consideration of whether an intraocular pressure test was required.

The instruction proposed by Ms. Harris also failed to correctly state the law. It stated only that the jury should consider whether "reasonable prudence under the circumstances" required additional tests and failed to specify what skill and training the jury should assume in making this judgment. *See* Clerk's Papers, at 36. The instruction should have been framed in the language of RCW 7.70.040(1) and RCW 4.24.290, *i.e.,* whether a reasonably prudent ophthalmologist, possessing the degree of skill, care, and learning possessed by other ophthalmologists in the state of Washington, and acting in the same or similar circumstances as the defendant, would have performed an intraocular pressure test. *Compare* RCW 4.24.290; RCW 7.70.040(1).[5]

II

Ms. Harris also assigns error to the trial court's limitation of Professor Harris' expert testimony. She contends that the court improperly limited his testimony in certain areas solely because he was not licensed to practice medicine.

---

[5]WPI 105.01 sets forth a proper form of a general reasonable prudence instruction which may also be given, if the first sentence is omitted. *See* WPI 105.01.

In general, expert testimony is required when an essential element in the case is best established by an opinion which is beyond the expertise of a layperson. 5A K. Tegland, Wash. Prac., *Evidence* § 300 (1982). Medical facts in particular must be proven by expert testimony unless they are "observable by [a layperson's] senses and describable without medical training". *Bennett v. Department of Labor & Indus.,* 95 Wn.2d 531, 533, 627 P.2d 104 (1981). Thus, expert testimony will generally be necessary to establish the standard of care (*Douglas v. Bussabarger,* 73 Wn.2d 476, 479, 438 P.2d 829 (1968)),[6] and most aspects of causation (*Bennett,* at 533; *O'Donoghue v. Riggs,* 73 Wn.2d 814, 824, 440 P.2d 823 (1968)).

While most courts have imposed per se limitations on the testimony of otherwise qualified nonphysicians (*see, e.g., Rodriguez v. Jackson,* 118 Ariz. 13, 17, 574 P.2d 481 (Ct. App. 1977)), such limitations are not in accord with the modern trend in the law of evidence generally. That trend is away from reliance on formal titles or degrees. 5A K. Tegland, § 290.

> The witness need not possess the academic credentials of an expert; practical experience may suffice. Training in a related field or academic background alone may also be sufficient. [ER] 702 states very broadly that the witness may qualify as an expert by virtue of knowledge, skill, experience, training, *or* education.

(Footnotes omitted.) 5A K. Tegland, § 289; *see, e.g., Walker v. Bangs,* 92 Wn.2d 854, 859-60, 601 P.2d 1279 (1979) (attorney not per se disqualified to testify as expert

---

[6]This will remain true even under the reasonable prudence standard of care, since the factual question of whether a particular medical practice is reasonably prudent is generally neither observable by or describable by a layperson. In some exceptional circumstances, laypersons may be capable of balancing the costs and benefits of a particular procedure and deciding whether it was reasonably prudent. *See, e.g., Helling,* at 517–19; *see generally* 51 Wash. L. Rev. 167, 183–84 (1975). This will be true, however, only when the underlying costs and probabilities can be expressed in relatively exact quantitative terms and there are no significant judgment factors involved. *See, e.g., Helling,* at 517–19. Moreover, these underlying facts must be proven by expert testimony.

in legal malpractice action because not licensed in this state); *State v. Brooks,* 16 Wn. App. 535, 539–40, 557 P.2d 362 (1976) (witness who had received training in ballistics and done considerable research and study in area could testify as ballistics expert even though primary field of expertise was serology and tool–marking comparison). We agree with the late Dean Wigmore that "the line between chemistry, biology, and medicine is too indefinite to admit of a practicable separation of topics and witnesses". 2 J. Wigmore, *Evidence* § 569, at 790 (rev. 1979).

▮ An expert witness is not per se disqualified from testifying in a medical malpractice action as to causation, reasonable prudence, or underlying facts tending to prove the ultimate facts. *Huttner v. MacKay,* 48 Wn.2d 378, 293 P.2d 766 (1956), cited by defendants, is not authority to the contrary. In that case, we did affirm the exclusion of an anatomist's testimony on the issue of negligence; however, our decision was premised on two grounds—that "[the anatomist] was not a neurosurgeon and did not practice in the community, *and* there was no showing that he was familiar with the accepted practices of neurosurgeons". (Italics ours.) *Huttner,* at 387. Moreover, *Huttner* was decided at a time when the standard of care applied in medical malpractice actions was that practiced by the average member of the profession. Since that standard no longer governs, we need not, and do not, decide whether nonphysicians may testify· regarding customary medical practice.

Our rejection of the rule that nonphysicians are per se disqualified from testifying as experts in medical malpractice actions should not be read as requiring that they always or even usually be allowed to testify. Trial courts retain broad discretion in determining whether an expert is qualified and will be reversed only for manifest abuse. *See Balmer v. Dilley,* 81 Wn.2d 367, 372, 502 P.2d 456 (1972). Moreover, whether or not the expert is licensed to practice medicine is certainly an important factor to be taken into account in making this determination. *See, e.g., Vanderhoff*

*v. Fitzgerald,* 72 Wn.2d 103, 108, 431 P.2d 969 (1967). We hold simply that it may not be considered dispositive.

In the present case, we believe that, contrary to Ms. Harris' contention, the trial court did not limit Professor Harris' testimony in any area *solely* because he did not possess a license to practice medicine. Rather the court gave several reasons for limiting Professor Harris' testimony, only one of which was the fact that he did not have a license to practice medicine. Its general conclusion was simply that some areas were "outside the field of his expertise." Report of Proceedings, at 71, 73. Especially in light of the fact that the trial court did permit extensive testimony by Professor Harris in some areas, we cannot say that the limitations it imposed constituted a manifest abuse of discretion.

### CONCLUSION

Our holding today may be summarized as follows. The standard of care against which a health care provider's conduct is to be measured is that of a reasonably prudent practitioner possessing the degree of skill, care, and learning possessed by other members of the same profession in the state of Washington. The degree of care actually practiced by members of the profession is only some evidence of what is reasonably prudent—it is not dispositive.

Absent exceptional circumstances such as were present in *Helling,* expert testimony will be necessary to show whether or not a particular practice is reasonably prudent. It will also usually be necessary to prove causation. This expert testimony may be provided by nonphysicians, however, if the trial court finds them qualified. The possession of a license to practice medicine, while important, is only one factor to be considered.

In the present case, Ms. Harris' proposed instruction was overly broad and was hence properly refused by the trial court. The court also acted within its discretion in limiting the testimony of Professor Harris to areas within his field of expertise.

The judgment is affirmed.

WILLIAMS, C.J., and ROSELLINI, STAFFORD, BRACHTEN-BACH, DOLLIVER, DIMMICK, and PEARSON, JJ., concur.

DORE, J., concurs in the result.