FILED
COURT OF APPEALS
DIVISION II

2014 JAN 28 AM 9: 52

STATE OF WASHINGTON

BY_____
                    DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42897-1-II |
| Respondent, | |
| v. | |
| JOSE VALENCIA-HERNANDEZ, aka JAIME JOSE LLAMAS, JAIME LLAMAS-HERNANDEZ, | UNPUBLISHED OPINION |
| Appellant. | |

HUNT, J. — Jose Valencia-Hernandez appeals his sentence and jury convictions for first degree arson, possession of methamphetamine with intent to deliver while armed with a firearm, and first degree unlawful possession of a firearm. He argues that the trial court erroneously (1) denied his motion for continuance; (2) denied his motion to sever counts; (3) admitted surveillance videos; (4) allowed Detective Bill Sofianos, whom Valencia-Hernandez asserts was not a qualified expert, to testify about the significance of a statue of Jesus Malverde; (5) denied his request to impeach Detective Spencer Harris; (6) commented on evidence presented; (7) denied his (Valencia-Hernandez's) request to relocate custody officers; (8) rolled his eyes when overruling his counsel's objection; (9) overruled his objection during the State's closing rebuttal arguments; and (10) miscalculated his sentencing range. Valencia-Hernandez also argues that the evidence is insufficient to support his convictions. We affirm.

FACTS

I. CRIMES

A. Arson

Just before 5 AM on March 5, 2010, Richard Cox called 911 to report a fire; he called back later to add that he had seen a "black SUV" leaving the scene at a high speed. 2 Report of Proceedings (RP) at 267. When Deputy Jesse Henschel arrived at the scene, he saw (1) a Nissan Altima and a BMW engulfed in flames a few feet from the residence, which appeared to be in danger of catching fire; and (2) two men attempting to put out the fire. Henschel and Deputy Justin Messman found two partially melted gas cans and two plastic gas can caps at the scene.

Messman later discovered that a nearby 7-11 convenience store sold gas cans with labels and price tag stickers matching those on the gas can caps found at the scene of the fire. Sergeant Duncan Hoss and Deputy Robin Yakhour followed up by investigating this 7-11 as a possible source of the fire-starting items. The 7-11 store clerk, Bahadur Singh, told them he had sold two gas cans that morning, and the store manager, Harpreet Kaur, showed them a surveillance video of two Hispanic males purchasing two one-gallon gas cans, two V8 bottles, and a Bic lighter at 4:06 AM: One wore a red jacket with white stripes on it and appeared to have a light brown skin tone; the other wore a black puffy-type jacket. Kaur later made a copy of this surveillance video, which Yakhour picked up, marked with the case and victim's names, and gave to Hoss, who logged it into evidence.

Also on March 5, Hoss and Yakhour investigated a nearby AM/PM store as another possible source of the fire-starting items. The store manager let Hoss run that store's surveillance video, which showed (1) a dark-colored Range Rover pulling into the AM/PM store

around 4:12 AM; and (2) two men matching the description of the men in the 7-11 video, carrying gas cans: one in a red coat with white stripes on it and the other wearing a black, puffy type jacket, and boots. Hoss copied the relevant portions of the surveillance video onto a computer thumb drive, which he later copied onto a CD that he entered into evidence.

A few days later, Karissa Courtway, who had been at her boyfriend Jonathan Tapia-Farias's residence, the scene of the fire, told Yakhour that (1) she used to date Valencia-Hernandez, (2) suspected he had caused the fires because one or two months earlier he had told her he wanted to light Tapia-Farias's car on fire, and (3) Valencia-Hernandez lived in Meadow Wood Apartments and owned a Range Rover. Hoss went to the Meadow Woods apartment where Valencia-Hernandez allegedly lived and saw a dark-colored Range Rover parked outside the unit, within 1000 feet of a school bus zone.

Hoss obtained and executed a search warrant at Valencia-Hernandez's apartment to collect evidence of the earlier arson. Outside the apartment, the officers found work boots matching those worn by the black-puffy-jacketed suspect in the convenience stores' surveillance videos. Inside the apartment, Hoss found a red jacket matching the red jacket of the man in the surveillance videos, a gun case, a receipt from Portland Tire and Wheels made out to "Jose Valencia"[1] at that Meadow Woods Apartment address, a glass bowl containing what appeared to be methamphetamine, a glass smoking pipe, ziplock bags, packaging material, a methamphetamine test kit, a digital scale, a clear plastic bag containing suspected methamphetamine, a statue of Jesus Malverde with a photograph of Valencia-Hernandez on the

---

[1] 6 RP at 885.

3

base of the statue, three firearms (two of which contained loaded magazines), a bag with "multiple magazines . . . generally of rifle caliber,"[2] another bag containing both handgun and rifle magazines, a temporary identification card bearing the name Jose Valencia-Hernandez, and a Costco card with a picture of Valencia-Hernandez on the back. Sofianos later discovered a telephone bill addressed to "Jose Valencia,"[3] inside the kitchen, a photograph of Valencia-Hernandez bare-chested with handguns tucked in his belt, and several vacuum sealed packages containing "large shards"[4] of methamphetamine[5] in a hole in the ceiling.

Hoss, Sofianos, and Detective Steven Fox investigated the Range Rover that had been parked outside Valencia-Hernandez's apartment. Inside they found two empty V8 juice bottles, a 7-11 plastic bag, two Bic lighters, and gas can tags that said "gasoline" on one side and "gasoline/oil mix" on the other side. 3 RP at 447. A DNA test later found a match between swabs collected from the inside of one of the V8 juice bottles and Valencia-Hernandez.

### B. "Kidnapping"

Sometime later in March, Courtway went with Valencia-Hernandez to Oregon. When Tapia-Farias called Courtway from jail on March 22, she told Tapia-Farias that Valencia-Hernandez had kidnapped her and wanted to take her to California. A few months later, Valencia-Hernandez was arrested and booked into Clark County jail on June 10, 2010.

---

[2] 7 RP at 921.

[3] 10 RP at 1354.

[4] 11 RP at 1368.

[5] One package weighed about 1.8 pounds; another weighed just under 1 pound. A Washington State Patrol Crime Lab later tested these drugs and found them positive for methamphetamine.

## II. PROCEDURE

The State charged Valencia-Hernandez with first degree arson (count 1), possession of a controlled substance with intent to deliver—methamphetamine (count 2), first degree unlawful possession of a firearm (counts 3-5), felony harassment (count 6), unlawful imprisonment (domestic violence) (count 7), intimidating a witness (count 8), and tampering with a witness (count 9). Valencia-Hernandez remained in custody throughout his trial.

### A. Pretrial Motions

Having already continued the trial date seven times, the trial court granted Valencia-Hernandez's September 22, 2011 request for an October 31 trial date. On October 12, Valencia-Hernandez filed a motion to sever counts, which the trial court later denied. On October 27, the trial court reminded the parties that the trial would go forward on October 31; and both agreed. Three days before trial, however, Valencia-Hernandez objected to the October 31 trial date and again moved to continue, stating he needed the time to complete witness interviews. The trial court denied this motion.

Trial commenced on October 31, at which time Valencia-Hernandez renewed his motion to continue, which the trial court denied as untimely. Valencia-Hernandez also asked the trial court to reposition the custody officers, arguing that their presence created an aura that Valencia-Hernandez "is an extremely dangerous character." 1 RP at 65. The trial court also denied this request.

### B. Trial

The State's witnesses testified to the facts previously described, with the exception of Courtway, who recanted her earlier kidnapping report to the sheriff's office and testified instead

that she had made up the story. Courtway also testified that (1) she had agreed to go to California with Valencia-Hernandez; (2) on the way to California, they had stayed with his childhood friend Saul Carrillo in Eugene, Oregon; (3) she had "freaked out"[6] when they drove through Eugene and asked to be taken home; and (4) Valencia-Hernandez had dropped her at a car dealership and given her $9500 in cash.

### 1. Surveillance videos

Valencia-Hernandez objected to the State's offer of the surveillance videos from the 7-11 and AM/PM stores, arguing that they lacked a proper foundation for admission into evidence. The State then presented four witnesses who laid foundations. Valencia-Hernandez moved for a mistrial, arguing that (1) the surveillance videos lacked foundation, and (2) the trial judge had "appeared to roll [his] eyes" when Valencia-Hernandez objected to admission of the surveillance videos. 3 RP at 474. The trial judge expressed surprise because he did not recall rolling his eyes[7], asked Valencia-Hernandez's counsel to check "the logs,"[8] and later instructed everyone in the courtroom, including the jury, to disregard people's body language.

### 2. Jesus Malverde statue; attempted impeachment

Detectives Harris and Sofianos testified about the relevance of finding the Jesus Malverde statue at Valencia-Hernandez's apartment. During his years of experience, executing

---

[6] 14 RP at 1681.

[7] At the start of trial, out of the jury's presence, the trial judge had mentioned he had sciatica (a pinched nerve) that could lead to fidgeting, standing up, and grimacing facial expressions. He later explained to the jury that his grimacing and fidgeting was not a comment on what the attorneys did in court.

[8] 3 RP at 474.

search warrants, and extensive training on clues to look for in narcotics trafficking, Sofianos had learned that Jesus Malverde was known as the "patron saint" of drug smugglers in Latino drug sub-culture and that Jesus Malverde was a narcotics trafficking clue. 10 RP at 1225.

During recess, Valencia-Hernandez stated his intention to impeach Harris about an "IAD"[9] investigation that had resulted in his suspension "for failing to deliver certain required information to the department." 13 RP at 1628. Valencia-Hernandez represented that he had "actual documented suspension for [Harris's] failing to be truthful to the department"; but when the trial court asked for this documentation, Valencia-Hernandez responded that he could not "prove it up by extrinsic evidence." 13 RP at 1630. The trial court denied the impeachment request.

### 3. Recorded jail conversation

The State played for the jury the recorded jail cell conversation between Courtway and Tapia-Farias. Because part of the recording appeared unintelligible, the trial court (1) told the jury that although the transcript of the recorded conversation read, "It's not a big deal," the trial court had heard, "It's not a good deal," 15 RP at 1835; and (2) stressed to the jury, "I reinforce with you, it's what you heard that's the evidence, it's not that printed page, okay?" 15 RP at 1835. Valencia-Hernandez did not object.

### 4. Motion to dismiss; verdict

Valencia-Hernandez later moved to dismiss the charges of intimidating a witness and tampering with a witness on grounds that the State did not present evidence of his having attempted to change or to influence Courtway's testimony or of his knowledge that Courtway

---

[9] The record does not state the basis for this acronym.

would serve as a witness. The trial court dismissed the intimidating charge but denied the motion to dismiss the tampering charge (count 9). The State withdrew the felony harassment charge (count 6).

The jury acquitted Valencia-Hernandez of unlawful imprisonment (count 7) and tampering with a witness (count 9). It convicted him of the remaining counts, finding him guilty of first degree arson (count 1), possession of a controlled substance—methamphetamine with intent to deliver while armed with a firearm and within 1000 feet of a school zone (count 2), and first degree unlawful possession of a firearm (counts 3, 4, and 5).

## C. Sentencing

At sentencing, the State recommended (1) 36 to 48 months of incarceration for first degree arson (count 1), based on an offender score of three; (2) 152 to 184 months for his level three possession of a controlled substance with intent to deliver methamphetamine (count 2), which recommendation included an additional 60 months for having committed this crime while armed with a firearm and an additional 24 months for having committed this crime within 1,000 feet of a school zone; and (3) 31-41 months for first degree unlawful possession of a firearm (counts 3 to 5), based on an offender score of three. Valencia-Hernandez objected to the State's recommendation for count 2, arguing that (1) possession of methamphetamine with intent to distribute is a Class B, not a Class A, felony; (2) thus, the firearm enhancement should be 36, not 60, months; and (3) consequently, the sentencing range should be 128 to 160 months.

The State also recommended that Valencia-Hernandez receive 171 days credit for time served. Valencia-Hernandez did not propose a different credit for time served.

The trial court imposed concurrent sentences of 48 months in prison for count 1, 160 months for count 2 (including the special firearm and school zone enhancements), and 41 months for counts 3, 4, and 5, with 171 days credit for time served. Valencia-Hernandez now appeals "every portion of the Felony Judgment and Sentence." *Spindle* (Notice of Appeal).

ANALYSIS

I. CONTINUANCE

Valencia-Hernandez argues that the trial court abused its discretion in denying his motion to continue the October 31 trial date because this ruling rendered him unable to complete witness interviews before trial. We disagree.

A defendant is not "entitled to a continuance as a matter of right." *State v. Early*, 70 Wn. App. 452, 457-58, 853 P.2d 964 (1993), *review denied*, 123 Wn.2d 1004 (1994). Whether to grant continuance is discretionary with the trial court, whose decision we will not overturn unless the trial court abused that discretion. *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004).

Valencia-Hernandez concedes that he had eight and a half months to prepare for trial. We further note that (1) the trial court had already granted seven continuances; and (2) a month before trial, at a September 22 hearing, Valencia-Hernandez did not object to the October 31 trial date, did not request an alternate trial date, and pushed the trial court to hear the case sooner. Instead, he waited until only three days before trial to ask for this continuance to interview witnesses. We hold that the trial court did not abuse its discretion in denying this last minute motion for continuance.

## II. Severance

Valencia-Hernandez next argues that the trial court erred in denying his motion to sever counts because none of the charges shared a single element of proof. Because the evidence for various counts was cross admissible and Valencia-Hernandez fails to show prejudice from their joinder, we hold that the trial court did not abuse its discretion in denying his motion for severance.

Washington law does not favor separate trials. *State v. Dent*, 123 Wn.2d 467, 484, 869 P.2d 392 (1994). We review a trial court's decision on a motion for severance for manifest abuse of discretion. *State v. Bythrow*, 114 Wn.2d 713, 717, 790 P.2d 154 (1990). Defendants seeking severance must show that a trial involving multiple counts would be so manifestly prejudicial as to outweigh the concern for judicial economy. *Bythrow*, 114 Wn.2d at 718. To determine whether the potential prejudice requires severance, the trial court considers four factors: (1) the strength of the State's evidence on each count, (2) the jury's ability to compartmentalize the evidence, (3) the ability to instruct the jury to consider each count separately, and (4) the cross admissibility of evidence among various counts. *State v. MacDonald*, 122 Wn. App. 804, 815, 95 P.3d 1248 (2004).

Valencia-Hernandez argues that (1) other than Valencia-Hernandez's identity, the remaining counts that went to trial did not share elements of proof; (2) except for the jacket and boots, the evidence was not cross admissible; (3) the kidnapping evidence was weak; (4) the jury's exposure to all charges during a single trial prejudiced him; and (5) repetition of witnesses hampered judicial economy. We disagree.

First, Valencia-Hernandez cites no authority for the proposition that the charges must share other elements of proof besides his identity. Second, evidence was cross admissible to establish Valencia-Hernandez's identity and mens rea for multiple counts; and a majority of the same witnesses testified about more than one count, such as Courtway, Sofianos, and Hoss. Third, the trial court properly instructed the jury to compartmentalize the evidence and to decide each count separately[1]; for example, jury instruction 3 stated, "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." Clerk's Papers (CP) at 405 (Instruction No. 3). Fourth, Valencia-Hernandez fails to show that trying these "three disparate cases"[10] together was so manifestly prejudicial as to outweigh the concern for judicial economy. We hold that the trial court did not manifestly abuse its discretion in denying the motion to sever.

### III. Custody Officers in Court

Valencia-Hernandez also argues that the trial court erred in refusing his request to have his two custody officers sit in a more neutral location in the courtroom.[11] We will not review issues that a party inadequately briefs or treats in passing. *State v. Thomas*, 150 Wn.2d 821, 868-69, 83 P.3d 970, *abrogated in part on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed.2d 177 (2004). Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration. *State v. Johnson*, 119 Wn.2d 167, 171,

---

[10] Br. of Appellant at 22.

[11] Valencia-Hernandez contends that (1) during his trial, two heavily armed officers wearing bulletproof vests, holding guns and tasers, sat directly behind him, one to each side; and (2) this created the impression that he was highly dangerous, which violated his constitutionally protected presumption of innocence.

829 P.2d 1082 (1992). Generally we will not review an assignment of error without argument and citation to authority. *State v. Cox*, 109 Wn. App. 937, 943, 38 P.3d 371 (2002). Contrary to RAP 10.3(a)(6), Valencia-Hernandez fails to support his factual assertions with citation to the record and fails to support his legal argument with citation to authority in his appellant's brief.[12] Therefore, we do not further consider this argument.

## IV. EVIDENCE

Valencia-Hernandez next challenges several of the trial court's evidentiary rulings. The admissibility of evidence is within the sound discretion of the trial court, which decisions we review with great deference under a manifest abuse of discretion standard. *State v. Vreen*, 143 Wn.2d 923, 932, 26 P.3d 236 (2001). Such is not the case here.

### A. Surveillance Videos

Valencia-Hernandez argues that the trial court erred in admitting the 7-11 and AM/PM surveillance videos over his objection and without proper foundation. We agree with the State that it properly authenticated both the videos and that the trial court did not abuse its discretion in allowing the videos into evidence.

ER 901 requires proper authentication of videos as a condition precedent to admissibility. For authentication purposes, courts treat video tape recordings like photographs, which Washington courts have a policy of liberally admitting. *State v. Newman*, 4 Wn. App. 588, 593, 484 P.2d 473, *review denied*, 79 Wn.2d 1004 (1971). To lay a proper foundation for admitting a

---

[12] Valencia-Hernandez's citation to *Holbrook v. Flynn*, 475 U.S. 560, 569, 106 S. Ct 1340, 89 L. Ed. 2d 525 (1986) in his reply brief, (in response to the State's citing this case in its brief of respondent), comes too late. We do not consider arguments raised for the first time in a reply brief. *See Johnson v. Phoenix Assur. Co. of New York*, 70 Wn.2d 726, 729, 425 P.2d 1 (1967).

video tape recording, some witness, not necessarily the photographer, must be able (1) to show when, where, and under what circumstances the video tape recording was taken; and (2) to testify that the video accurately portrays the subject illustrated. *State v. Tatum*, 58 Wn.2d 73, 75, 360 P.2d 754 (1961). If these two criteria are met, the video tape recording is admissible at the trial court's discretion. *Newman*, 4 Wn. App. at 593.

### 1. 7-11 video

Multiple witnesses testified about the circumstances under which the video recording was taken and that the copy offered at trial accurately portrayed the subject illustrated. Bahadur Singh testified that he was the store clerk in the 7-11 video who sold two gas cans to two men on March 5, 2010. Store manager Harpreet Kaur testified that (1) this 7-11 took and kept surveillance videos on a daily basis in the regular course of business, (2) she had viewed the surveillance video with Deputy Robin Yakhour and had made a copy for her, and (3) the video accurately depicted the front clerk area of the store and what she had viewed with Yakhour. Yakhour testified that she had picked up a copy of the video from the 7-11, put it in a CD case on which she had handwritten the case name and victim's name, and given the copy to Sergeant Duncan Hoss. And Hoss testified that he had watched the original 7-11 surveillance video and that State's exhibit 134 was an accurate depiction of that video and of the copy Yakhour had given him and which he had logged into evidence. We hold that the State properly authenticated the 7-11 video (State's exhibit 134) and that the trial court did not abuse its discretion in admitting it into evidence.

## 2. AM/PM video

Sergeant Hoss testified that on the morning of March 5, 2010, (1) he had gone to the AM/PM station; (2) the store manager had escorted him to the backroom and shown him how to run the surveillance video; (3) he had personally reviewed the surveillance video and observed two men in the video carrying gas cans, which men matched the general description of the men in the 7-11 video; (4) he had copied this portion of the surveillance onto his thumb drive and later copied his thumb drive onto a CD, which he entered into evidence; and (5) State's exhibit 133 accurately depicted the surveillance video he had viewed at the AM/PM station. We hold that the State properly authenticated the AM/PM video (State's exhibit 133) and that the trial court did not abuse its discretion in admitting it into evidence.

### B. Detective Sofianos' Expert Testimony

Valencia-Hernandez argues that the trial court erred in allowing Detective Bill Sofianos to testify as an expert about the drug-culture significance of Jesus Malverde because Sofianos admitted on cross-examination that he was not an expert and because his testimony was highly prejudicial. We disagree. At the outset, we note that Valencia-Hernandez misreads the record: Sofianos did *not* admit on cross that he was not an expert. Thus, we focus our analysis on the prejudice part of Valencia-Hernandez's argument.

We review a trial court's decision to admit expert testimony for abuse of discretion. *Tatum*, 58 Wn.2d at 76. The admissibility of expert testimony under ER 702 depends on whether (1) the witness qualifies as an expert, (2) the opinion is based upon an explanatory theory generally accepted in the scientific community, and (3) the expert testimony will be helpful to the trier of fact. *State v. Allery*, 101 Wn.2d 591, 596, 682 P.2d 312 (1984). To qualify

as an expert, a witness need not possess academic credentials; practical experience may suffice. *Harris v. Groth*, 99 Wn.2d 438, 449, 663 P.2d 113 (1983). A witness may qualify as an expert by virtue of knowledge, skill, experience, training, or education. ER 702; *Harris*, 99 Wn.2d at 449. The trial court must evaluate both the relevance of the testimony and its prejudicial impact, excluding unnecessarily cumulative or unfairly prejudicial testimony. *State v. Petrich*, 101 Wn.2d 566, 575, 683 P.2d 173 (1984).[13]

The record shows that Sofianos possessed the requisite practical experience, knowledge, skill, and training to testify about Jesus Malverde. Sofianos' knowledge of Jesus Malverde stemmed from his experience with Latino drug subculture and extensive training on clues to look for in narcotics trafficking, such as Jesus Malverde. Sofianos testified that he had executed search warrants that were consistent with his training and knowledge of Jesus Malverde. Sofianos had also trained in narcotics investigations through the Drug Enforcement Agency, the El Paso Intelligence Center, "ATF", and the Coast Guard, to name a few. 11 RP at 1373. Sofianos provided the trial court with supplemental reading material about Jesus Malverde, to which Valencia-Hernandez did not object. We hold that Sofianos qualified as an expert in the significance of Jesus Malverde in narcotics investigations.

---

[13] *Abrogated on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988).

We also hold that Sofianos' testimony was not unduly prejudicial.[14] To minimize prejudice, the trial court specifically limited the scope of Sofianos' testimony about Jesus Malverde to the specific purpose of supporting the identity and intent elements at issue. Consistent with this limitation, the State used the Jesus Malverde shrine evidence sparingly, keeping within the trial court's limits. The State also proved identification and intent with an array of other evidence, such as surveillance equipment, police scanner, digital scale, packaging materials, bags of methamphetamine, a methamphetamine testing kit, and three functional and loaded firearms, all discovered inside Valencia-Hernandez's locked bedroom. The bedroom also contained a Washington identification card and a Costco card bearing Valencia-Hernandez's name and photograph, and a red jacket that matched the jacket worn by Valencia-Hernandez, which also matched the suspect in the 7-11 and AM/PM surveillance videos. In light of this other evidence and the trial court's limitations on Sofianos' Jesus Malverde testimony, we hold that this latter testimony did not significantly prejudice or impact the outcome of the case to warrant reversal.

---

[14] Valencia-Hernandez also argues that Sofianos' testimony, coupled with information that Jesus Malverde was not accepted by "any church," branded Valencia-Hernandez as a drug dealer with no respect for religion. Br. of Appellant at 24. Valencia-Hernandez mischaracterizes Sofianos' testimony: Sofianos did not testify that Jesus Malverde was "not accepted" by any church; rather, he said, "[T]hough not recognized as a *saint* by any churches, he's commonly referred to as the saint of drug trafficking." 11 RP at 1384 (emphasis added).

## C. Recorded Jailhouse Conversation

Valencia-Hernandez argues that the trial court violated his constitutional rights and "ER 605(4)"[15] by impermissibly commenting on the jailhouse recording of the conversation between Courtway and Tapia-Farias by providing his own interpretation of what Courtway said. But Valencia-Hernandez makes no reference to the record to support this assertion, contrary to RAP 10.3(a)(6); nor does the record before us show what portion of the recorded conversation the trial court played for the jury. Because Valencia-Hernandez neither cites nor provides "those portions of the verbatim report of proceedings necessary to present the issues raised on review,"[16] contrary to RAP 9.2(b), we cannot adequately evaluate the context in which the trial court made the challenged comment.[17] Accordingly, we do not further consider this argument.

## V. REQUEST TO IMPEACH DETECTIVE HARRIS

Valencia-Hernandez next argues that the trial court erred in denying his request to "impeach Detective Harris with his suspension for a breach of Department policy." Br. of Appellant at 24. This argument fails because Valencia-Hernandez did not proffer foundational evidence of Detective Harris's suspension. When Valencia-Hernandez asked to impeach Detective Harris with the "actual documented suspension," the trial court required, "Then bring

---

[15] Br. of Appellant at 26. There is no such "ER 605 (4)"; ER 605 addresses the competency of a judge as a witness at trial.

[16] RAP 9.2(b).

[17] Similarly, we lack an adequate record on which to decide whether to accept the State's concession that the trial court improperly commented on the evidence. The State, however, rebuts any presumed prejudice by demonstrating from the record that no prejudice could have resulted. *State v. Levy*, 156 Wn.2d 709, 723, 132 P.3d 1076 (2006).

me, bring me the information, and I don't mean some article from the Columbian, before I'll let it in." 13 RP at 1630. Despite claiming to have the actual documented suspension, Valencia-Hernandez did not produce such documentation; instead, his counsel said, "Well, Judge, I mean, I can't, I can't prove it up by extrinsic evidence." 13 RP at 1630.

Admission of extrinsic evidence of a witness's character may be allowed, in the court's discretion. ER 608. Here, the trial court asked for documentation of the alleged suspension that Valencia-Hernandez wanted to use to impeach Harris. But Valencia-Hernandez did not provide it. We hold, therefore, that the trial court did not abuse its discretion in denying Valencia-Hernandez's request to impeach Harris with this unsupported alleged misconduct.

## VI. MISTRIAL

Valencia-Hernandez argues that the trial court denied his Sixth and Fourteenth Amendment rights[18] by refusing to grant a mistrial after the judge rolled his eyes and gave a look of surprise while ruling on Valencia-Hernandez's motion to strike the convenience store surveillance videos. But Valencia-Hernandez's Brief of Appellant cites neither to the record nor to legal authority to support this assertion, contrary to RAP 10.3(a)(6). Thus, we do not further consider this argument.[19]

---

[18] U.S. CONST. amends. VI, XIV.

[19] Even if we considered the merits of Valencia-Hernandez's argument, he does not show that the trial court abused its broad discretion in refusing to grant a mistrial and instead, electing to instruct the jury (and everyone in the courtroom) to disregard his body language.

## VII. CLOSING ARGUMENT

Valencia-Hernandez argues that the trial court erred in preventing him from objecting fully during the State's rebuttal closing argument and by "cut[ting] him off sharply and refus[ing] to allow him to make a full record." Br. of Appellant at 29. But he provides no citation to the record to support this argument, contrary to RAP 10.3(a)(6). Accordingly, we do not further consider this argument.

## VIII. SENTENCING

Valencia-Hernandez argues that the trial court erred in accepting the State's proposed sentencing range by (1) elevating count 2, possession of methamphetamine with intent to deliver, to a class A felony; and (2) failing to give him proper credit for time served. These arguments fail because the trial court properly applied sentencing enhancements and sentenced Valencia-Hernandez within the standard range and gave Valencia-Hernandez proper credit for time served.

### A. Standard/Scope of Review

A defendant may appeal a standard range sentence only if the sentence (1) fails to comply with the procedural requirements of the "Sentencing Reform Act (SRA)"[20]; or (2) raises a constitutional issue.[21] *State v. Osman*, 157 Wn.2d 474, 481-82, 139 P.3d 334 (2006) (citing *State v. Mail*, 121 Wn.2d 707, 711-13, 854 P.2d 1042 (1993)). To appeal under this first criterion, the defendant must show that the sentencing court failed to follow a duty to follow some specific

---

[20] RCW 9.94A.585.

[21] Valencia-Hernandez raises no sentence-related constitutional issues.

19

SRA procedure. Absent such a showing, the clear rule of RCW 9.94A.585 applies and appeal of a standard range sentence is not allowed. *Mail*, 121 Wn.2d at 712.

B. Possession of Methamphetamine with Intent To Deliver While Armed with Firearm

More specifically, Valencia-Hernandez argues that the trial court erred in elevating his possession of methamphetamine with intent to distribute to a class A felony, instead of a class B felony, thus, increasing his sentencing range by 48 months. We disagree.

RCW 9.94A.518 provides that seriousness level "III" drug offenses include: "[a]ny felony offense under chapter 69.50"; "Possession of Ephedrine, Pseudoephedrine, or Anhydrous Ammonia with intent to manufacture methamphetamine," delivery by a person "[o]ver 18" of "methamphetamine . . . to someone under 18"; and "[m]anufacture of methamphetamine." RCW 9.94A.517's "Drug Offense Sentencing Grid" provides that an offender score of 3 to 5 with a seriousness level of "III" has a sentence range of "68+ to 100 months" of confinement.[22] RCW 9.94A.533(6)[23] adds an additional school zone enhancement of 24 months to the standard sentence range. Under RCW 9.94A.533(3)(a), committing a felony while armed with a firearm adds five years to the standard sentence range for any Class A felony or a felony with a statutory maximum sentence of at least 20 years.

---

[22] The legislature amended RCW 9.94A.517 in 2013. LAWS OF 2013, ch. 14, § 1. The amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

[23] The legislature amended RCW 9.94A.533 in 2011, 2012 and 2013. LAWS OF 2013, ch. 270, § 2; LAWS OF 2012, ch. 42, § 3; LAWS OF 2011, ch. 293, § 9. The amendments did not alter the statutes in any way relevant to this case; accordingly, we cite the current version of the statute.

The jury returned special verdicts finding that Valencia-Hernandez (1) had used a firearm in committing a Violation of the Uniform Controlled Substances Act (VUCSA)[24]; and (2) had committed this VUCSA violation within 1000 feet of a school zone. His conviction for possession of a controlled substance with intent to deliver methamphetamine while armed with a firearm fit within seriousness level "III". With an offender score of 3, the sentencing range of "68 months to 100 months" conformed with RCW 9.94A.517 and RCW 9.94A.518. CP at 542. The school zone and firearm sentencing enhancements added 24 months and 60 months, respectively, to the standard sentence range of 68–100 months; with these enhancements, Valencia-Hernandez's sentence range for count 2 totaled 152-184 months of confinement. The trial court, therefore, did not err in sentencing Valencia-Hernandez to 160 months for count 2.

## C. Credit for Time Served

For the first time on appeal, Valencia-Hernandez challenges the amount of credit the trial court gave him for time served. Generally, a party cannot raise an issue for the first time on appeal unless it is a "manifest error affecting a constitutional right." RAP 2.5(a). *See also State v. Munguia*, 107 Wn. App. 328, 340, 26 P.3d 1017 (2001). This exception to the general rule does not automatically mandate review whenever a criminal defendant identifies some constitutional issue not raised below. *State v. McFarland*, 127 Wn.2d 322, 333-34, 899 P.2d 1251 (1995). Rather, the appellant must show actual prejudice in order to establish that the error is "manifest." *McFarland*, 127 Wn.2d at 333. Valencia-Hernandez fails to meet these tests.

---

[24] RCW 69.50.401 and RCW 69.50.435. The legislature amended RCW 69.50.401 in 2013. LAWS OF 2013, ch. 3, § 19. The amendment did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

Valencia-Hernandez fails to show that the alleged error is "manifest." At the sentencing hearing, the State recommended that Valencia-Hernandez receive 171 days credit for time served. Not only did Valencia-Hernandez fail to propose a different number of days of credit below, but also he fails to establish actual prejudice on appeal in that he fails to show on the record before us that he was entitled to additional credit days. Accordingly, we do not further consider this issue.

## IX. STATEMENT OF ADDITIONAL GROUNDS

In Valencia-Hernandez's Statement of Additional Grounds (SAG), he asserts that the State erred in "deviating"[25] from the standard sentencing range because (1) the State did not present sufficient evidence to support his convictions, and (2) the trial court failed to issue a "Stipulated Agreement" to support imposing an "exceptional sentence." Statement of Additional Grounds (SAG) at 3. Valencia-Hernandez's assertion that the jury lacked sufficient evidence to "convict him outside the [sentencing] guidelines" has no bearing on the correctness of the imposed standard-range sentence. SAG at 3. Thus, we do not further address this point.

Similarly, his challenge to an "exceptional sentence" without a "stipulated agreement" is unsupportable.[26] Not only is there no such rule requiring a "stipulated agreement" to justify an exceptional sentence, but also the trial court here did not impose any exceptional sentences. Thus, we do not further consider this point.

---

[25] Statement of Additional Grounds (SAG) at 3.

[26] We first note that Valencia-Hernandez's sentence was within the standard range, not an "exceptional" sentence. SAG at 3. Second, he cites RCW 9.94A.105 (now recodified as RCW 9.94A.480), which has no bearing on his claims: Instead, this statute addresses delivery of a judgment and sentence document to the "caseload forecast council"; it has nothing to do with requiring a stipulated agreement. SAG at 3.

No. 42897-1-II

We affirm Valencia-Hernandez's convictions and sentences.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Hunt, J.

We concur:

Worswick, C.J.

Johanson, J.